In the

# United States Court of Appeals
### For the Seventh Circuit

_____

Nos. 13-1552 & 13-1553

MARGARET WRIGHT,

*Plaintiff-Appellant, Cross-Appellee,*

*v.*

ILLINOIS DEPARTMENT OF CHILDREN
AND FAMILY SERVICES,

*Defendant-Appellee, Cross-Appellant.*

_____

Appeals from the United States District Court for the
Central District of Illinois.
No. 1:09-cv-01085-MMM-JAG — **Michael M. Mihm**, *Judge.*

_____

ARGUED JANUARY 20, 2015 — DECIDED AUGUST 14, 2015

_____

Before RIPPLE and ROVNER, *Circuit Judges,* and KENNELLY,
*District Judge.**

RIPPLE, *Circuit Judge.* Margaret Wright retired from her
position as a caseworker at the Peoria Field Office of the

_____

*The Honorable Matthew F. Kennelly of the United States District Court
for the Northern District of Illinois, sitting by designation.

Illinois Department of Children and Family Services ("the Department") after the Department ordered her to undergo a fitness-for-duty evaluation. Ms. Wright then filed this action alleging, among other claims, that the Department had violated the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12112(d)(4)(A), by ordering her to undergo the evaluation and by causing her subsequent constructive discharge. The case was tried before a jury ("*Wright I*"), which found in favor of Ms. Wright on the ADA claim but awarded no compensatory damages. The Department filed a motion for judgment as a matter of law or, alternatively, for a new trial, contending that Ms. Wright had failed to establish an ADA violation and that the jury had been instructed improperly. The district court granted the Department's motion for a new trial.

During the second trial ("*Wright II*"), after Ms. Wright rested her case, the Department moved for judgment as a matter of law on the ground that Ms. Wright had failed to establish that she had been constructively discharged. The court granted the motion and entered judgment for the Department. Ms. Wright now appeals the district court's order granting a new trial in *Wright I* and its order granting the Department's motion for judgment as a matter of law in *Wright II*. The Department appeals the court's order denying its motion for judgment as a matter of law on the ADA claim in *Wright I*.

We hold that the district court did not err in denying the Department's motion for judgment as a matter of law in *Wright I.* On the record before it, there was a genuine issue of material fact as to whether the Department's fitness-for-duty evaluation order was consistent with business necessity. The

district court did not err in granting a new trial in *Wright I*. The initial constructive discharge jury instruction failed to reference the Department's conduct. Finally, the court did not err in granting the Department's motion for judgment as a matter of law in *Wright II*. Ms. Wright did not establish that the Department's conduct communicated that her termination was imminent. Accordingly, we affirm the judgment of the district court.

# I

## BACKGROUND

### A.

From 1982 to 2007, Ms. Wright worked for the Illinois Department of Children and Family Services, primarily as a caseworker.

In 2005, Ms. Wright became the caseworker for CPL, a then-ten-year-old ward of the Department. CPL resided at the Rice Child and Family Center ("Rice"). Having experienced physical and sexual abuse, CPL suffered from post-traumatic stress disorder and was highly medicated. She had undergone several hospitalizations for psychiatric problems and had been placed in multiple homes.

Following an incident at Rice on April 19, 2007, Dr. Petronilo Costa interviewed CPL. According to Dr. Costa, Ms. Wright threw CPL into a "manicking frenzy" by telling her that there were four foster families available for her, even though CPL was not yet on the Department's

foster-care list due to her emotional issues.[1] In response to Ms. Wright's comments, CPL began saying that, because she was leaving Rice, she no longer had to listen to anyone and did not have to take her medication. CPL's frenzy incited a riot in her unit at Rice during which the children threw and broke furniture and attempted to attack the staff. Dr. Costa, who described Ms. Wright's conduct as "unheard of," concluded that Ms. Wright posed a risk to CPL.[2]

Following up on his conclusion, Dr. Costa issued a medical order to the Department barring Ms. Wright from having further contact with CPL. After receiving Dr. Costa's order, Mary Bullock, the Department's assistant administrator for the central region, contacted a Rice staff member, Jill Foster (Ms. Wright's supervisor), and Foster's supervisor. Bullock then directed that Ms. Wright have no further contact with CPL. Ms. Wright made several inquiries to Bullock and Foster about why she was ordered to have no contact with CPL, but the Department did not provide her with any additional information.

On May 2, 2007, Bullock removed Ms. Wright from CPL's case. Ms. Wright, who as a member of a union was covered by a collective bargaining agreement ("CBA"), filed a grievance in response to her removal. The next day, Bullock and Foster met with Dr. Costa and others at Rice to discuss the situation. Dr. Costa told Bullock and Foster that Ms. Wright "runs her own shop" and "that she tries to

---

[1] R.279 at 177–78.

[2] *Id.* at 141.

terrorize folks."[3] At that same meeting, either Bullock or Foster told Dr. Costa that Ms. Wright was "unsupervisable," "[t]hat she would not get along with any supervisor," and that her failure to follow orders once resulted in a lasting injury to a child.[4] They also told him that she "did not get along with anybody in the office, that she would not do what she was assigned to," "[a]nd that she had had plenty of grievances and lawsuits against everyone."[5] They stated "that they had been concerned about her for a long time and that at this time they were going to ask her to go for an assessment to see if she was fit to have that type of work."[6] Dr. Costa "backed up" their decision to ask for an assessment.[7] At the end of the meeting, Dr. Costa agreed to put this recommendation in writing. Thereafter, Dr. Costa wrote a letter, dated May 15, 2007, which stated that he "believe[d] that there [was] enough clinical data to wonder about Ms. Maggie Wright's ability to work with children" and that "her mental health needs to be assessed."[8]

Following the meeting, Bullock talked with Larry Chasey, an associate deputy director of the Department and Bullock's supervisor, and David Hoover, a labor relations

---

[3] *Id.* at 147.

[4] *Id.* at 149.

[5] *Id.* at 150.

[6] *Id.*

[7] *Id.*

[8] R.126 at 31.

specialist and supervisor. These discussions focused on whether to discipline Ms. Wright or to order a fitness-for-duty evaluation. Relying in part on Dr. Costa's letter, Bullock then ordered that Ms. Wright undergo an evaluation. Ms. Wright was notified of the evaluation order on June 4, 2007, and her evaluation was scheduled for June 20 in Chicago. The notice informed Ms. Wright that she had "exhibited behavior that put[] into question [her] personal safety and that of others in the workplace."[9] In the medical examination recommendation, Bullock provided the following description of Ms. Wright's "behavior/illness":

> Ms. Wright has a history of defiance to all levels of management, she does not trust management and fails to provide any information that she feels would not reflect well on her. She has failed to see risk to children in foster care and to report incidents of unexplained injury. Many cases have had to be removed from her caseload and she refused to accept agency decisions or she was verbally abusive and had an abrasive manner with foster parents and they requested a change in caseworker or they would ask for child's removal from their home. She has consistently refused to follow her management chain of supervision by contacting Deputy Directors. Ms. Wright is demanding in her demeanor, she has a demanding presence to her voice,

---

[9] R.279 at 37.

> appears to physically be very stressed, her face is flushed, she fans herself as if very flushed. She has blatant disregard for any rules or procedures both inside the agency and outside the agency whether it is the residential schedule or a school schedule. She demands attention immediately. She makes derogatory remarks about anyone who makes a clerical mistake, clerical do not want to do work for her a[s] they fear her rath [sic] and disdain.[10]

Ms. Wright filed a grievance protesting the evaluation order. After a meeting with Ms. Wright and her union representative on June 7, 2007, the Department cancelled the order because it had cited the wrong CBA section and because the doctor's office was located too far away.[11]

---

[10] R.150-1 at 31.

[11] The CBA provided that the Department would serve written charges on an employee when it had good cause to believe that the employee had engaged in workplace misconduct. The employee, her union representative, and a Department manager then would attend a predisciplinary hearing where the employee could offer a rebuttal to the charges. After the rebuttal, the Department had forty-five days to decide whether to discipline the employee.

The CBA also authorized the Department to order an employee to undergo a fitness-for-duty evaluation when there was good cause to believe that she may be unable to perform the essential functions of her position. The evaluation request had to be approved at all levels of the Department's management and by its labor relations office. If an employee refused to be evaluated, the Department could charge her with insubordination and impose discipline. The continued refusal to submit to the evaluation could result in discharge.

(continued…)

On July 9, 2007, Pete Wessel, another labor relations specialist at the Department, sent Ms. Wright a memorandum informing her that she was required to undergo a fitness-for-duty evaluation on July 16, 2007, at the office of Dr. R. Patil. Ms. Wright again refused to be evaluated and filed a grievance. The Department then charged Ms. Wright with insubordination for not attending the evaluation. After a predisciplinary hearing, Ms. Wright received a fifteen-day suspension.

On July 30, 2007, Ms. Wright was placed on desk duty. While on desk duty, she could not oversee any cases. During her time on desk duty, she was given no new work duties.

On August 2, 2007, Ms. Wright received a "second and final" order to undergo an evaluation with Dr. Patil, scheduled for August 22.[12] Ms. Wright then served her fifteen-day suspension from August 5 to August 20. On August 22, Ms. Wright went to Dr. Patil's office but did not submit to an evaluation. Instead, she questioned Dr. Patil

---

(…continued)

The Illinois Department of Central Management Services ("CMS"), which provides management services for over sixty Illinois agencies, was responsible for overseeing the disciplinary actions brought against Department employees. Within a twelve-month period, the Department, acting on its own, could discipline an employee with a thirty-day suspension. CMS had to approve any other or additional discipline. If the Department determined that an employee should be discharged, it would place her on a thirty-day suspension pending discharge, and CMS would make the final discharge decision.

[12] R.281 at 109.

about why an evaluation was ordered and what he knew about her work status.

Ms. Wright received her second insubordination charge for refusing to be evaluated on September 4, 2007. Ms. Wright did not attend the predisciplinary hearing on September 5. Instead, her union representative gave a rebuttal to the charges. Ms. Wright then used her vacation time and was away from work between September 7 and September 17.

On September 7, 2007, Ms. Wright received in the mail a bill for health insurance premiums from CMS. Her health insurance premiums ordinarily were deducted from her paycheck, but because she was not paid during her fifteen-day suspension, she had no paycheck from which to deduct the premiums and owed that portion of her premiums. The bill also stated that payment was due for the period between September 1 and September 30. The second page of the bill stated: "ENROLLMENT INFORMATION—Effective 09 06 2007"; "LEAVE OF ABSENCE DOCK/SUSP > 30 Days."[13] Ms. Wright called CMS to ask about the bill and, as a follow-up to that call, only paid the premiums that were owed on account of her fifteen-day suspension. At no point during this period did Ms. Wright receive any notice from the Department informing her that she had received an additional suspension, including a suspension pending discharge.

On September 13, 2007, while she was on vacation, Ms. Wright contacted the State Employees' Retirement

---

[13] R.150-2 at 17; *accord* R.275 at 89.

System of Illinois to determine the impact that quitting or being discharged would have on her pension. She learned that she was eligible to retire with a reduced pension. Although Ms. Wright and her husband, who also worked for the Department, had planned on retiring in December of 2008 when they were eligible to receive full pensions, they decided to retire early because Ms. Wright believed that she eventually would be discharged. Ms. Wright returned to work after her ten-day vacation period on September 17, 2007, and submitted her paperwork for retirement, effective September 30, 2007.

Prior to her retirement, the Department had not decided what discipline to impose on Ms. Wright. Department officials testified that they were contemplating issuing a third evaluation order with the hope that Ms. Wright could be convinced to comply. After Ms. Wright retired, the Department abandoned its efforts to discipline her, and the union withdrew Ms. Wright's grievances.

**B.**

On March 10, 2009, Ms. Wright filed this action alleging twelve counts against seven defendants.[14] For the purposes

---

[14] Specifically, Ms. Wright alleged that Bullock, Foster, Wessel, Dr. Costa, and Cindy Petty invaded her Fourth and Fourteenth Amendment privacy rights by ordering her to undergo a fitness-for-duty evaluation (Counts I–V); that Dr. Costa, Petty, the Children's Home and Aid Society, and Foster interfered with her employment relationship with the Department (Counts VI–IX); that Foster and Bullock intentionally inflicted emotional distress on her (Counts X and XI); and that the Department violated the ADA (Count XII).

of this appeal, she contested only the disposition of the ADA claim (Count XII), which alleged that the Department violated 42 U.S.C. § 12112(d)(4)(A) by ordering her to undergo a fitness-for-duty evaluation, resulting in her constructive discharge. At the first trial (*Wright I*), the district court instructed the jury that the Department had to prove by a preponderance of the evidence that the order for Ms. Wright to undergo a fitness-for-duty evaluation was job-related and consistent with business necessity. If the jury found for Ms. Wright on that issue, it then had to decide whether her retirement "was voluntary or constituted a constructive discharge."[15] The jury returned a verdict for Ms. Wright. It concluded that Ms. Wright was constructively discharged from her employment, but awarded her no compensatory damages.

Following the jury's verdict, the Department filed a renewed motion for judgment as a matter of law or for a new trial under Federal Rules of Civil Procedure 50 and 59. The Department contended that, as a matter of law, it had not constructively discharged Ms. Wright. In the alternative, it maintained that a new trial was warranted because the court incorrectly had instructed the jury on the elements of constructive discharge.

The district court denied the Department's motion for judgment as a matter of law; it concluded that a reasonable jury could find that ordering the evaluation was not consistent with business necessity. The court granted, however, the Department's motion for a new trial; it

---

[15] R.218 at 37.

concluded that the jury instruction, as given, focused too much on the employee's subjective belief rather than on the employer's conduct.

The second trial (*Wright II*), focused solely on the constructive discharge issue. Ms. Wright presented essentially the same evidence as that presented in *Wright I*. After the close of Ms. Wright's case, the Department moved for judgment as a matter of law, contending that Ms. Wright did not establish that her discharge was involuntary or that her termination would occur immediately. The district court granted the Department's motion, concluding that Ms. Wright did not establish that her working conditions were intolerable. In its memorandum opinion, the court explained that, in order to prevail on a constructive discharge claim under the theory relied upon by Ms. Wright, a plaintiff must demonstrate that the Department had taken actions that would communicate to a reasonable employee that she would be terminated *and* also must show that her working conditions had become intolerable. Although the district court was willing to say that a jury could determine that Ms. Wright reasonably could conclude that her employment was about to be terminated, there was insufficient evidence to permit the jury to conclude that the conditions of her employment had become unbearable.

As this case comes to us, both parties ask us to review the district court's decisions. Ms. Wright challenges the district court's order granting a new trial in *Wright I* and, of course, the court's order in *Wright II*, granting the Department's motion for judgment as a matter of law because she had not produced sufficient evidence of a constructive discharge. For its part, the Department challenges the court's order denying

the Department's motion for judgment as a matter of law in *Wright I* concerning the fitness-for-duty evaluation.[16]

# II

# DISCUSSION

## A.

We first address the Department's contention that it was entitled to judgment as a matter of law in *Wright I*. The district court decided "that the jury could have concluded that the fitness-for-duty request was not based on business necessity."[17] The court noted that the Department had "presented the jury with evidence that showed that it was in receipt of a letter from the ward's psychiatrist indicating Wright's conduct interfered with the ward's therapy."[18] It also recognized, however, that "other evidence presented could certainly lead a jury to the conclusion that this was not an unsolicited letter, but rather one her supervisors sought out."[19] The court further noted that "the evidence presented showed that the normal practice of [the Department was] to place an employee subject to a fitness for duty evaluation on administrative leave or give the person restricted duties;

---

[16] The district court had jurisdiction under 28 U.S.C. § 1331. We have jurisdiction over this appeal under 28 U.S.C. § 1291.

[17] R.235 at 12.

[18] *Id.* at 11.

[19] *Id.*

however, Wright continued her day-to-day duties after the decision to subject her to an [evaluation] was made."[20]

The Department contends that "no reasonable jury could find that the Department did not perceive that Wright's ability to perform the duties of a caseworker was impaired, and that ordering an evaluation to discover whether and to what extent she was impaired in performing those duties was not consistent with business necessity."[21] It submits that Ms. Wright exhibited inappropriate behavior between 2004 and 2007, displayed boundary issues with CPL, undermined CPL's treatment team, and acted aggressively toward the staff at Rice. The Department relies, in part, on two communications from Dr. Costa to support its order that Ms. Wright undergo a fitness-for-duty evaluation. First, on April 20, 2007, Dr. Costa issued an order that barred Ms. Wright from having further contact with CPL. Second, on May 15, 2007, Dr. Costa wrote Bullock a letter suggesting "that there is enough clinical data to wonder about Ms. Maggie Wright's ability to work with children and families in the capacity with which she is working now."[22] He stated that Ms. Wright's "mental health needs to be assessed to help to determine what type of work she will be able to effectively do for [the Department]."[23]

---

[20] *Id.*

[21] Appellee's Br. 35–36. Citations to the Appellant's or Appellee's Briefs, unless otherwise indicated, are to their initial brief on appeal.

[22] R.126 at 31.

[23] *Id.*

We review a district court's decision denying judgment as a matter of law de novo and will "reverse the verdict only if no rational jury could have found for the prevailing party." *EEOC v. AutoZone, Inc.*, 707 F.3d 824, 834–35 (7th Cir. 2013). The ADA provides, in relevant part:

> A covered entity shall not require a medical examination and shall not make inquiries of an employee as to whether such employee is an individual with a disability or as to the nature or severity of the disability, unless such examination or inquiry is shown to be job-related and consistent with business necessity.

42 U.S.C. § 12112(d)(4)(A). All employees, regardless of whether they have a qualifying disability under the ADA, are protected under this subsection.[24]

According to the enforcement guidance provided by the EEOC, an "examination is job-related and consistent with business necessity when an employer has a reasonable belief based on objective evidence that a medical condition will

---

[24] *See Murdock v. Washington*, 193 F.3d 510, 512 (7th Cir. 1999) (per curiam); *see also Bates v. Dura Auto. Sys., Inc.*, 767 F.3d 566, 573 (6th Cir. 2014); *Owusu-Ansah v. Coca-Cola Co.*, 715 F.3d 1306, 1310–11 (11th Cir. 2013); U.S. Equal Emp't Opportunity Comm'n, *Enforcement Guidance: Disability-Related Inquiries and Medical Examinations of Employees Under the Americans with Disabilities Act (ADA)* (July 27, 2000), http://www.eeoc.gov/policy/docs/guidance-inquiries.html [hereinafter "EEOC Guidance"] (noting that "the use of the term 'employee' in this provision reflects Congress's intent to cover a broader class of individuals and to prevent employers from asking questions and conducting medical examinations that serve no legitimate purpose").

impair an employee's ability to perform essential job functions or that the employee will pose a threat due to a medical condition."[25] *Coffman v. Indianapolis Fire Dep't*, 578 F.3d 559, 565 (7th Cir. 2009). The employer's reasonable belief "must be based on *objective evidence* obtained, or reasonably available to the employer, prior to making a disability-related inquiry or requiring a medical examination. Such a belief requires an assessment of the employee and his/her position and cannot be based on general assumptions." EEOC Guidance (emphasis in original); *accord Tice v. Centre Area Transp. Auth.*, 247 F.3d 506, 518 (3d Cir. 2001) (noting that "[t]he ADA's requirement that [a fitness-for-duty examination] be consistent with business necessity is an objective one").

An employer bears the burden of establishing that an examination is consistent with business necessity, *see Thomas v. Corwin*, 483 F.3d 516, 527 (8th Cir. 2007), and that burden is "quite high," *Conroy v. New York State Dep't of Corr. Servs.*, 333 F.3d 88, 97 (2d Cir. 2003) (internal quotation marks omitted). An employer must "show that the asserted 'business necessity' is vital to the business," as opposed to a "mere expediency." *Id.*; *accord Kroll v. White Lake Ambulance Auth.*, 763 F.3d 619, 623 (6th Cir. 2014) (noting that an

---

[25] We previously have recognized that, "[a]lthough not binding on this court, such administrative interpretations do constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance." *O'Neal v. City of New Albany*, 293 F.3d 998, 1009 (7th Cir. 2002) (internal quotation marks omitted); *see also Coffman v. Indianapolis Fire Dep't*, 578 F.3d 559, 565 (7th Cir. 2009) (relying on the EEOC enforcement guidance).

employer cannot rely on a "bare assertion that a medical examination was merely convenient or expedient"). In addition, the examination must "genuinely serve[] the asserted business necessity and … must be a reasonably effective method of achieving the employer's goal." *Conroy*, 333 F.3d at 98. An employer "cannot merely rely on reasons that have been found valid in other cases but must actually show that the … requirement contributes to the achievement of those business necessities."[26] *Id.* at 101.

Courts consequently require that an employer provide "significant evidence that could cause a reasonable person to inquire as to whether an employee is still capable of performing his job." *Sullivan v. River Valley Sch. Dist.*, 197 F.3d 804, 811 (6th Cir. 1999); *see also Conroy*, 333 F.3d at 98

---

[26] The statute expresses Congress's desire to prohibit an employer from harassing, or otherwise discriminating against, employees who are able to perform efficiently the essential functions of their jobs. *See* S. Rep. No. 101-116, at 39 (1989) (noting that "[a]n inquiry or medical examination that is not job-related serves no legitimate employer purpose, but simply serves to stigmatize the person with a disability," and that "the actual performance on the job is, of course, the best measure of ability to do the job"); EEOC Guidance ("The ADA's provisions concerning disability-related inquiries and medical examinations reflect Congress's intent to protect the rights of applicants and employees to be assessed on merit alone, while protecting the rights of employers to ensure that individuals in the workplace can efficiently perform the essential functions of their jobs."); *see also Brownfield v. City of Yakima*, 612 F.3d 1140, 1146 (9th Cir. 2010) (noting that the statute "prohibits employers from using medical exams as a pretext to harass employees or to fish for nonwork-related medical issues and the attendant unwanted exposure of the employee's disability and the stigma it may carry" (internal quotation marks omitted)).

(noting "that courts will readily find a business necessity … when the employer can identify legitimate, non-discriminatory reasons to doubt the employee's capacity to perform his or her duties"). That an employee's behavior could be described as "annoying or inefficient [does not] justify an examination; rather, there must be genuine reason to doubt whether that employee can perform job-related functions." *Sullivan*, 197 F.3d at 811 (internal quotation marks omitted). In contrast, "[w]e have acknowledged that inquiries into an employee's psychiatric health may be permissible when they reflect concern for the safety of employees and the 'public at large.'" *Coffman*, 578 F.3d at 565 (quoting *Krocka v. City of Chicago*, 203 F.3d 507, 515 (7th Cir. 2000)). In undertaking this analysis, "an employer's standard practice with regard to medical examinations is certainly relevant evidence of what is 'necessary,'" as is "an employer's differential application of a medical examination requirement." *Tice*, 247 F.3d at 518.

Accordingly, we must determine here whether, based on the evidence presented, a reasonable jury could find (1) that the Department did not have a reasonable belief based on objective evidence that Ms. Wright was unable to perform the essential functions of her job or that she posed a threat to herself or to others based on a medical condition; or (2) that Ms. Wright's examination did not genuinely serve the Department's asserted business necessity.

In our view, the district court correctly determined that the evidence submitted at trial was insufficient to establish, as a matter of law, that requiring Ms. Wright to undergo a fitness-for-duty evaluation was consistent with business necessity. Several Department employees testified that it was

the Department's common practice to place a caseworker on desk duty when she was ordered to undergo an evaluation. Specifically, Wessel, a labor relations specialist at the Department, testified that "for employees who are field workers that go out into the field, … I don't recall any where they were not placed on desk duty" following a request for an evaluation.[27] He also testified that, during his time with the Department, all employees who worked in the field and who were asked to undergo a fitness-for-duty evaluation were placed on desk duty.[28] Chasey, an associate deputy director of the Department, testified that "typically when someone is sitting for an [evaluation] or going for an [evaluation], we put them on some sort of administrative restriction—desk duty, something like that—and we should have done that in this situation."[29] He was not aware of any caseworker who ever had been ordered to undergo a psychiatric evaluation without also having been placed on desk duty or administrative leave.

In contrast to the Department's customary practice, Ms. Wright was not placed on desk duty when she was ordered to undergo a fitness-for-duty evaluation on June 4. Instead, for almost two months, she continued to oversee her normal case load, which included approximately twenty-two cases. The Department's inconsistent application of its evaluation procedures provided objective evidence that the

---

[27] R.278 at 59.

[28] *See id.* at 81; R.282 at 71.

[29] R.279 at 88.

evaluation order was not consistent with business necessity, creating a genuine issue of material fact for the jury.[30] *Cf.*

---

[30] The cases on which the Department relies underscore the peculiarity of the Department's decision to order that Ms. Wright undergo an evaluation without placing her on desk duty. In none of those cases did an employee who was thought to be unable to perform her job remain active in her position. Instead, the employees were placed on some form of administrative leave at the time the evaluation was ordered. *See Owusu-Ansah*, 715 F.3d at 1309 (noting that Owusu-Ansah was "placed on paid leave to allow for further evaluation"); *Brownfield*, 612 F.3d at 1143 (noting that Brownfield's supervisor placed him on administrative leave when he ordered him to undergo a fitness-for-duty examination); *Coffman*, 578 F.3d at 562 (noting that a supervisor "recommended that Coffman be transferred immediately from firefighting and EMS duties to 'limited duty status'" when he recommended that she undergo an examination); *Thomas v. Corwin*, 483 F.3d 516, 523 (8th Cir. 2007) (noting that Thomas was placed in a "sick leave pool" pending her fitness-for-duty evaluation); *Lanman v. Johnson Cty.*, 393 F.3d 1151, 1154 (10th Cir. 2004) (noting that "Lanman was placed on administrative leave on May 9, pending the results of a psychological fitness for duty exam"); *Sullivan v. River Valley Sch. Dist.*, 197 F.3d 804, 809 (6th Cir. 1999) (noting that the school district suspended Sullivan with pay pending its decision concerning whether to require that he undergo a fitness-for-duty examination); *Cody v. Cigna Healthcare of St. Louis, Inc.*, 139 F.3d 595, 597 (8th Cir. 1998) (noting that the employer "offer[ed] Cody a paid leave of absence with her return contingent upon undergoing a psychiatric evaluation"); *cf. Timmons v. Gen. Motors Corp.*, 469 F.3d 1122, 1125 (7th Cir. 2006) (noting that after the examination revealed that he was unfit to work, "Timmons was put on disability leave that day"); *Tice v. Centre Area Transp. Auth.*, 247 F.3d 506, 510 (3d Cir. 2001) (noting that the employer required that Tice submit to an examination before he would be allowed to return to work). Although an employer's decision to place, or not to place, an employee on administrative leave is not determinative, it is evidence that the jury can consider in determining whether the evaluation truly served a business necessity.

*Tice*, 247 F.3d at 518 (noting that Tice did not "produce[] evidence sufficient to create a genuine issue of fact as to the necessity of the" examination because he did not establish that other similarly situated employees were treated differently).

In addition, in early July, Ms. Wright was assigned a *new* case. Indeed, Bullock recognized that it was a "sensitive case" and testified that, although she had requested that Ms. Wright undergo the evaluation, she never considered taking the case away from her.[31] Significantly, Bullock admitted at trial that she had thought it "somewhat contradictory to send a caseworker in to a fitness-for-duty evaluation because she may be a risk to children and at the same time continue to assign cases to her."[32] She further testified that if she "sincerely believed that [Ms.] Wright was a risk to children," she would have removed her from those cases and "would not have assigned her a new case where she might go to the state of Mississippi and pick up a child."[33]

Further undermining the Department's position are emails between Foster and Hoover that indicate that the examination was unrelated to the Department's concerns about Ms. Wright's ability to perform her job. *Cf. Coffman*, 578 F.3d at 566 (noting that the employer's "e-mails paint a consistent picture of *genuine* concern that Coffman's behavior was uncharacteristic and was adversely impacting

---

[31] R.279 at 48.

[32] *Id.* at 50.

[33] *Id.* at 51.

her ability to perform her job" (emphasis added)). Foster emailed Hoover stating that placing Ms. Wright on desk duty would "serve no purpose."[34] The email continued:

> Putting her on desk duty would mean what? She can't go and see her clients in-person? She's a placement worker and has to travel to see folks. She's done most of that for the month already. For those that haven't been seen, that then puts the responsibility on other team members or myself.[35]

Hoover replied:

> The point is that if we believe that she is so incapable of doing her work that we're sending her to be checked out....why in the world would we continue to send her out to see kids and put them in danger.......It's not meant to get anything done....but to protect kids and our position.
>
> If on the other hand, you're saying she doesn't have any problems, then why am I wasting the agencies [sic] time, resources, and money?[36]

Foster responded that she "underst[ood] the complexity of it all," and stated that it was her opinion that Ms. Wright "shouldn't have been allowed to work for a number of years

---

[34] R.150-2 at 4.

[35] *Id.*

[36] *Id.* (ellipses in original).

now."[37] Foster, however, did not recommend that Ms. Wright be placed on desk duty. It was not until Chasey, who had not been involved in the decision to order Ms. Wright to undergo an evaluation, discovered that Ms. Wright had not been placed on desk duty that Ms. Wright finally was relieved of her case work.

The evidence presented at trial supports a finding that the Department did not believe that Ms. Wright posed a safety risk to the children with whom she worked and, instead, that it considered her competent to continue working with approximately two-dozen children. Given this evidence, a reasonable jury could determine that Ms. Wright's fitness-for-duty examination was not, in fact, consistent with business necessity. The district court therefore did not err in denying the Department's motion for judgment as a matter of law.

**B.**

We turn next to Ms. Wright's claim that the district court erred in granting a new trial after *Wright I.* During *Wright I,* the district court provided the jury with the following constructive discharge instruction:

> A constructive discharge occurs when an employee resigns or retires from employment, but the resignation or retirement was not truly voluntary.

---

[37] *Id.*

> A constructive discharge can occur in either of two ways.
>
> The first is when an employer makes the working condition sufficiently intolerable so that a reasonable person standing in the position of the employee would have resigned or retired.
>
> The second is when, at the time the employee resigns or retires, the employee reasonably believes that, had he not resigned or retired, he would have been immediately fired.[38]

The district court concluded that this instruction did not sufficiently explain the second type of constructive discharge, the one upon which Ms. Wright had premised her case. More precisely, the court believed that the instruction had unduly focused on the employee's *subjective* perception of the employer's actions that allegedly communicated to the employee that dismissal was inevitable. The focus, the court concluded, should be on the nature of the employer's actions and whether those actions were so intolerable as to communicate to a *reasonable* employee that her discharge was inevitable. In the district court's view, giving the instruction resulted in prejudicial error because it did not focus on an objective assessment of the employer's acts, an assessment reached through an evaluation of the totality of the circumstances surrounding the employer's treatment of the employee.

---

[38] R.218 at 38.

As a general proposition, we review a district court's decision to grant a new trial for an abuse of discretion.[39] However, when the motion for a new trial presents a purely legal issue, our review is de novo. *See United States v. Cotton*, 101 F.3d 52, 54 (7th Cir. 1996); *see also Cotts v. Osafo*, 692 F.3d 564, 567 (7th Cir. 2012) (noting that whether a jury instruction provided a fair and accurate statement of the governing law is a legal question reviewed de novo). Here, the district court determined that a new trial was warranted after concluding that "[t]he jury instruction [did] not accurately reflect the law."[40] Accordingly, our review is de novo. *Cf. Cotton*, 101 F.3d at 57 (holding that the district court's decision granting a new trial based on a faulty jury instruction was an incorrect determination of law). To determine whether a jury instruction accurately stated the law, we "examin[e] the instructions as a whole, in a common sense manner, avoiding nitpicking." *Lewis v. City of Chicago Police Dep't*, 590 F.3d 427, 433 (7th Cir. 2009).

The principles governing our review are well settled. An employee is constructively discharged when, from the standpoint of a reasonable employee, the working conditions become unbearable. *See Chapin v. Fort-Rohr Motors, Inc.*, 621 F.3d 673, 679 (7th Cir. 2010). An employee's constructive discharge can come in two forms. *See id.*

---

[39] *See Vojdani v. Pharmsan Labs, Inc.*, 741 F.3d 777, 781 (7th Cir. 2013); *Latino v. Kaizer*, 58 F.3d 310, 314 (7th Cir. 1995) (noting that, "[b]ecause the trial judge is uniquely situated to rule on such a motion, the district court has great discretion in determining whether to grant a new trial").

[40] R.235 at 7.

In the first form, an employee resigns due to alleged discriminatory harassment. Such cases require a plaintiff to show working conditions even more egregious than that required for a hostile work environment claim because employees are generally expected to remain employed while seeking redress, thereby allowing an employer to address a situation before it causes the employee to quit.

*Id.* (citation omitted). The second form of constructive discharge "occurs '[w]hen an employer acts in a manner so as to have communicated to a reasonable employee that she will be terminated.'" *Id.* (alteration in original) (quoting *EEOC v. Univ. of Chicago Hosps.*, 276 F.3d 326, 332 (7th Cir. 2002)).

The district court was on solid ground in deciding that its jury instruction incorrectly emphasized the employee's subjective belief. *See id.* at 679–80 (focusing on whether the employer acted in a manner that would have communicated to a reasonable employee that she will be terminated). Ms. Wright asserts that the initial instruction accurately conveyed the governing law because it used the phrase "reasonably believes." She submits that "a reasonable belief could only come from the actions of the Department in communicating to Wright that she was about to be fired."[41] But, contrary to Ms. Wright's assertion, the use of the term "reasonable" is insufficient to cure the deficiency in the initial jury instruction. A finding that Ms. Wright reasonably

---

[41] Appellant's Br. 43.

believed that she would be fired is not the same as a finding that a reasonable employee in Ms. Wright's position would believe, *based on the Department's actions*, that she imminently and inevitably would be terminated. Under the instruction originally provided, a jury could have premised liability on a determination that Ms. Wright had been constructively discharged because, after having performed her job poorly or otherwise acted improperly, she "reasonably believe[d] that" she "would have been immediately fired" "had [s]he not resigned or retired."[42] More specifically, the jury could have found that it was reasonable for Ms. Wright to believe that she would be fired solely because she failed to attend the second evaluation, which often results in an employee's termination. Our case law requires, however, that the jury consider whether a *reasonable* person would believe that her employer had *acted in a manner that communicated* that the employee would be terminated imminently, not simply whether the employee reasonably thought she would be terminated. The absence of any reference to the conduct of the employer was, as the district court concluded, reversible error.

Because the district court correctly concluded that the constructive discharge jury instruction did not fairly and accurately state the law, it did not err in granting a new trial.

---

[42] R.218 at 38.

## C.

Finally, we address whether the district court erred in granting the Department's motion for judgment as a matter of law in *Wright II*. We review de novo a district court's decision granting judgment as a matter of law. *Estate of Escobedo v. Martin*, 702 F.3d 388, 403 (7th Cir. 2012). "Judgment as a matter of law is appropriate when there is 'no legally sufficient evidentiary basis for a reasonable jury' to find for the nonmoving party." *Id.* (quoting *Zimmermann v. Chicago Bd. of Trade*, 360 F.3d 612, 623 (7th Cir. 2004)).

In granting the Department's motion, the district court concluded that, while "the prospect of discharge[] was certainly lurking," Ms. Wright's conditions of employment at the time she chose to retire voluntarily could not be characterized as intolerable or unbearable.[43] Therefore her departure could not be characterized as a constructive discharge. In the court's view, Ms. Wright simply "decided to unilaterally end the [disciplinary] process by retiring instead of allowing it to play out to its end."[44]

The district court was correct in its understanding that, under the second form of constructive discharge, an employee must prove that her working conditions had become intolerable. *See Chapin*, 621 F.3d at 679. In our prior cases, we have centered our inquiry on whether the employee's working conditions had become intolerable because the employer had conducted itself in a manner that

---

[43] R.260 at 4.

[44] *Id.*

made it objectively clear that the employee's discharge was imminent and inevitable. *See, e.g.*, *id.* at 679 (noting that "a working condition does not become intolerable or unbearable merely because a 'prospect of discharge lurks in the background'" (quoting *Cigan v. Chippewa Falls Sch. Dist.*, 388 F.3d 331, 333 (7th Cir. 2004))). An employee's work environment thus becomes intolerable under the second form of constructive discharge when *the employer's actions* communicate to the employee that she immediately and unavoidably will be terminated. Requiring that an employee demonstrate that she immediately will be discharged comports with the rationale underlying the constructive-discharge doctrine. We require that an employee's working conditions become intolerable before finding a constructive discharge "because employees are generally expected to remain employed while seeking redress." *See id.*

The parties really do not dispute the appropriate inquiry.[45] Their dispute is over whether Ms. Wright presented sufficient evidence to permit a jury to find that her discharge from the Department was certain and imminent when she announced her retirement. On this question, the

---

[45] Ms. Wright submits that "[t]he thread common to all of [our] cases is that the focus, in determining whether a plaintiff's working conditions were intolerable in a Type II constructive discharge situation, turns upon whether the employer's conduct would convey to a reasonable employee that he is about to be terminated." Appellant's Br. 37. The Department provides a similar formulation, stating that "intolerable" under the second form of constructive discharge "means the employee's working conditions are such that his opportunities with his employer are at an end." Appellee's Br. 48; *see also* Appellant's Second Br. 47 (noting that "[t]he Department apparently agrees with Wright's contention").

decision of the district court rests comfortably within our
case law.

In *University of Chicago Hospitals*, we held that the EEOC
had "demonstrated that a reasonable employee standing in
[the employee's] shoes would have believed that had she not
resigned, she would have been terminated." 276 F.3d at 332.
In that case, the employee arrived at work to find that "her
belongings were packed and her office was being used for
storage." *Id.* The employee also knew of her supervisor's
"intent, plan, and attempt to terminate her." *Id.* We
concluded that "[t]his environment, in which her employer
made reasonably clear to her that she had reached the end of
the line … [,] could have indeed been to a reasonable
employee unbearable." *Id.* Similarly, in *Kodish v. Oakbrook
Terrace Fire Protection District*, 604 F.3d 490 (7th Cir. 2010), we
held that an employee had been constructively discharged
because it was clear that "had [the employee] not resigned
he would have been terminated immediately." *Id.* at 502. We
relied on the evidence that the employee's supervisor had
"handed [him] a letter of resignation and informed him that
he could resign or be terminated immediately." *Id.* at 494.

In contrast to those cases, we have held that an employee
did not demonstrate that she was discharged constructively
when she received notice of her employer's intent to
commence a process that could lead to her discharge and
"the employer [did] not undermine the employee's position,
perquisites, or dignity in the interim." *Cigan*, 388 F.3d at 333.
We noted that to hold otherwise "would take us a long
distance indeed from 'unendurable working conditions' and
require courts to engage in speculation." *Id.* We questioned
how "a judge or jury [could] be confident that the

superintendent would not have changed his mind" and noted that "arrangements and assurances satisfactory to both sides may have been possible."[46] *Id.* "The only way to know how matters will turn out," we explained, "is to let the process run its course." *Id.* "Litigation to determine what *would* have happened, had the employee contested the recommendation, is a poor substitute for the actual results of real deliberation within the employer's hierarchy." *Id.* at 333–34 (emphasis in original). Simply put, "the prospect of being fired at the conclusion of an extended process is not itself a constructive discharge." *Id.* at 334; *see also Levenstein v. Salafsky*, 414 F.3d 767, 774–75 (7th Cir. 2005) (holding that the employee was not constructively discharged by being "put in a state of enforced idleness for almost a year" in part because the employer's investigation was still pending).

Most recently, in *Chapin*, we held that, "even construing all the evidence in Chapin's favor, no reasonable employee standing in Chapin's shoes would believe that had he not resigned, he would have been immediately fired." 621 F.3d at 680. We explained that "Chapin may have had ample reason to believe his termination to be imminent" when his employer had "threatened to fire him and very clearly tied that threat to his EEOC complaint"; however, after the employer retracted the threat, he "had no reason to continue to believe that." *Id.* Thus, "[u]nlike in *University of Chicago Hospitals*, there [was] nothing to indicate that a firing … was

---

[46] We also noted that the employee was not "given tasks demeaning to her education and accomplishments" and that "she held the same post and duties that she had found satisfactory for three decades." *Cigan v. Chippewa Falls Sch. Dist.*, 388 F.3d 331, 333 (7th Cir. 2004).

an imminent and inevitable event." *Id.* It was "not a situation where the 'handwriting was on the wall' and the plaintiff quit 'just ahead of [the] fall of the axe.'" *Id.* (quoting *Lindale v. Tokheim Corp.*, 145 F.3d 953, 956 (7th Cir. 1998)). We noted that, had Chapin "returned to work, without having withdrawn the EEOC charge, perhaps [his employer] would have fired him," or "his supervisors or coworkers may have constantly harassed him to the point where his safety was at risk." *Id.* We repeated, however, "that it is not a court's position to speculate on 'what ifs.'" *Id.* "This is particularly true," we explained, "in the constructive discharge context, where we recognize that the burden remains on the employee to show why he would have had to 'quit immediately, before he found the other job; why, in other words, his duty to mitigate damages did not require him to remain.'" *Id.* at 680–81 (quoting *Lindale*, 145 F.3d at 956).

This case law makes clear that the district court correctly concluded that Ms. Wright had failed to demonstrate that she was constructively discharged. There is no evidence that the Department had decided to terminate Ms. Wright. It certainly had not told Ms. Wright that she would be fired, nor did her supervisors' conduct suggest such a result was a certainty. *Cf. Kodish*, 604 F.3d at 502; *Univ. of Chicago Hosps.*, 276 F.3d at 332. Given the possibility of harm to the children with whom she inevitably would come in contact had she performed her regular duties, the Department quite reasonably assigned her to desk duty until the result of her fitness-for-duty examination could be evaluated. Moreover, while on desk duty, Ms. Wright had ample time to work on her grievance and, as far as the record discloses, to assist, if

she chose, other case workers.[47] Once she refused to submit to the examination, the Department initiated disciplinary proceedings against her. While those proceedings were pending, Ms. Wright chose to use her vacation time and remove herself from the office. Upon her return, she elected to submit her retirement paperwork.

Ms. Wright attempts to show that her termination was imminent by suggesting that employees who fail to undergo multiple fitness-for-duty evaluations typically are discharged. But, as we have noted, "[l]itigation to determine what *would* have happened … is a poor substitute for the actual results of real deliberation within the employer's

---

[47] During her testimony, Ms. Wright stated:

> Well, the workers who—on my team who got my cases already had full caseloads of their own, and I could have helped them. I could have—I could have staffed with them and told them what I knew and knew to be the status of their work or lack of work they would have. Oriented them to my cases.

> I could have helped them with those cases and other cases by pulling documents out of the file as needed for court reports, for administrative case reviews, staffings on children in residential care. There are a number of things that we do that require piles of documents pulled from the file in chronological order, and those are done by the caseworkers. I could have done that for them.

R.275 at 58–59. She then acknowledged that this type of work normally was done by caseworkers and that those were tasks that she "could have done and done within the restrictions" of her desk duty. *Id.* at 59. There is no evidence in the record that she was precluded from engaging in this type of work.

hierarchy." *Cigan*, 388 F.3d at 333–34 (emphasis in original); *accord Chapin*, 621 F.3d at 680 (refusing to speculate about what would have happened had the employee not given up his position). Like the employee in *Cigan*, Ms. Wright refused to wait for her employer's discharge process to run its course. That Ms. Wright *may* have been discharged at the conclusion of the disciplinary proceeding does not amount to a constructive discharge. *See Cigan*, 388 F.3d at 333–34.

Ms. Wright also relies on the insurance bill that she received from CMS, which contained a bureaucratic notation that she was suspended pending discharge. She admitted, however, that, had she actually been suspended pending discharge, she would have received a "notice in writing" from the Department and that the Department would have had "to hand-deliver it."[48]

The record is clear that Ms. Wright simply made the personal assessment that it was time to retire. She had contacted the State Employees' Retirement System, which told her that she and her husband "had enough credits and accumulated vacation and all to take an early retirement with a reduced pension."[49] When Ms. Wright "found out that [they] could take an early retirement, [she] called [her husband] at work, and it took seconds to make that

---

[48] *Id.* at 96. She further stated that she "didn't assume [that she had] been suspended" because the insurance bill was "not a formal notice from the Department." *Id.* at 98.

[49] *Id.* at 91. Specifically, she was told that they "had enough credits to retire under a different rule because [they] were 55 or older and [they] had 25 years of service." *Id.*

decision."[50] Her testimony makes clear that she had not contemplated leaving the Department until she learned that she could retire immediately and collect a reduced pension. Thus, it was not the Department's conduct or her belief that she immediately would be terminated that led to her retirement, but her realization that she could retire earlier than she initially had believed.

In sum, the evidence presented at trial demonstrates that the Department did not act in a manner that would communicate to a reasonable employee in Ms. Wright's position that the termination of her employment was imminent. Instead, the Department initiated a disciplinary proceeding against Ms. Wright and, while the Department's decision was pending, Ms. Wright elected to retire. The district court's decision falls within the heartland of our case law; the district court correctly granted the Department's motion for judgment as a matter of law.

### Conclusion

The judgment of the district court is affirmed.

AFFIRMED

---

[50] *Id.* at 91–92. Ms. Wright testified that it was "absolutely true" that, prior to her speaking with the State Employees' Retirement System, she did not "plan on retiring when [she] did." *Id.* at 107. Instead, she had planned "to stick it out until this was over"; she was going to let the disciplinary process "run its course." *Id.* at 101–02.