**NONPRECEDENTIAL DISPOSITION**
To be cited only in accordance with Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Argued October 3, 2017
Decided December 6, 2017

*By the Court:*

No. 16-3187

| | |
|---|---|
| DEANNA S. PAINTER, | Appeal from the |
| *Plaintiff-Appellant,* | United States District Court for the |
| | Central District of Illinois. |
| *v.* | |
| | No. 13 C 3002 |
| ILLINOIS DEPARTMENT OF | |
| TRANSPORTATION, | Richard Mills, |
| *Defendant-Appellee.* | *Judge.* |

## O R D E R

Deanna Painter claims that her former employer, the Illinois Department of Transportation ("IDOT"), required her to undergo unnecessary mental-health examinations in violation of the Americans with Disabilities Act, 42 U.S.C. §§ 12101–12213. The district court entered summary judgment for the IDOT, reasoning that a fact finder would have to conclude from the undisputed evidence that the challenged examinations were "job-related and consistent with business necessity." We affirm the judgment.

Painter began working as an Office Administrator for the IDOT's Division of Traffic Safety in September 2010. After many employees complained about her behavior, the IDOT put Painter on paid administrative leave and required that she submit to a fitness-for-duty examination. Dr. Fletcher, an occupational-medicine specialist, examined Painter and concluded that she could perform the essential functions of her job without posing a threat to herself or others. He did note, however, that Painter "displayed some hypomania" and "could be bipolar," so he recommended that she be reevaluated in 45 days. At that reevaluation he deferred making a

fitness-for-duty recommendation until Painter could be seen by a mental-health specialist. He referred her to Dr. Karen Lee, a psychologist. Painter met with Dr. Lee, but the psychologist did not send the IDOT a report because Painter retained her for treatment.

Despite Dr. Fletcher's inconclusive reevaluation, the IDOT allowed Painter to resume working in response to a grievance her union filed. She returned in October 2011 but transferred to a different division, still as an Office Administrator. Again she had difficulties with coworkers. Painter used work time to keep a detailed log of her new coworkers' conversations and other actions. She insisted the log was necessary for her to learn why she "was put on leave since no one would tell" her. Painter also sent numerous emails to her new supervisor, Stuart Hunt, often after the workday ended. For example, she emailed Hunt at 8 p.m. on October 30, 2011:

> I didn't talk about God . . . other than the one time Mike Fitzgerald asked me what I was listening to and I said a Christian radio station talking about blended families. . . . Isabel, for whatever reason one day told me that her mom works at the Marian Center downtown. I told her I had just bought a cross necklace there a couple of months back. It's a Catholic store. Also, she told me her little brothers and sisters had gone to Little Flower. I said I had gone to Little Flower from K–8 and sent my kids there for a little while but couldn't afford the entire time.

Hunt reacted by documenting his involvement in handling complaints about Painter's behavior. For example, on October 31, 2011, he noted for his file that one of Painter's coworkers had told him she was "fearful of . . . Deanna and was making other arrangements for her car-pool to pick her up in the evening as she and Deanna both leave work at the same time." Hunt gathered similar statements from other coworkers. He disciplined Painter for keeping the log, and he gave his file and the employee statements to Ryan Amerson, a labor-relations specialist. Amerson recommended that Hunt again place Painter on paid administrative leave, which, after conferring with his supervisor, Hunt did on November 23, 2011.

Five days later Marie Malek-Robinson, the IDOT's fitness-for-duty coordinator, retained psychiatrist Dr. Terry Killian to evaluate Painter's mental health. Dr. Killian met with Painter on December 2 and 16, 2011. He concluded that Painter was psychiatrically fit for duty, but the statements from her coworkers and supervisors

caused him to suspect she might suffer from a personality disorder. Even so, Dr. Killian cleared Painter to return to work.

She returned in January 2012, and the complaints from coworkers started anew. Hunt gathered more written statements about her behavior and forwarded them to Amerson. In March 2012 Hunt gave Painter a written reprimand for being argumentative. He also reprimanded her for speaking to coworkers in an unprofessional tone. Malek-Robinson contacted Dr. Killian in late April requesting that he again examine Painter. The next day Painter once more was placed on paid administrative leave.

A few days later Painter emailed her union representative, Tim Lynch. She wrote: "For the record, the clock in the small conference room being set to 4:30 p.m. when it was only 4:00 p.m.—that was a tell-tale sign for me. It told me everything I needed to know. Thanks." Lynch replied that he did not understand the reference to the clock and said that he thought the battery in the clock was dead. Painter responded, "Something's dead alright—however, I prefer to be 'a lady' and not say what I think is dead. :)." Lynch interpreted that statement as a death threat. He told Painter he would no longer represent her and demanded that she cease communicating with him. The IDOT also interpreted Painter's email as threatening and contacted the Illinois State Police. Whether the state police took any action is not disclosed in the record.

Dr. Killian conducted his second examination of Painter on May 8, 2012. This was the fifth medical examination directed by the IDOT: two with Dr. Fletcher, the occupational-medicine specialist; one with Dr. Lee, the psychologist retained by Painter; and two with Dr. Killian, the psychiatrist. This time Dr. Killian declared Painter unfit for duty because of her "paranoid thinking and the highly disruptive behavior which results from her paranoia."

Painter then filed this action claiming that the IDOT had violated the ADA by forcing her to attend unnecessary medical examinations. The ADA prohibits covered employers from requiring their workers to undergo medical exams that are not "shown to be job-related and consistent with business necessity." 42 U.S.C. § 12112(d)(4)(A). Damages may be awarded for a violation, *see id.* §§ 12117, 1981a(a)(2), and Illinois has legislatively waived its Eleventh Amendment immunity against claims for damages under the ADA, 745 ILL. COMP. STAT. 5/1.5(d). Painter also asserted in her complaint, but later abandoned, claims that the IDOT had discriminated against her on the basis of a real or perceived mental impairment and retaliated against her for filing a charge of

discrimination. As the case progressed, Painter further narrowed her § 12112(d)(4)(A) claim to exclude all but the two examinations by Dr. Killian. In entering summary judgment, the district court reasoned that the only conclusion a jury reasonably could draw is that the IDOT's "actions were based on legitimate concerns and its employees reasonably responded to the situation which they encountered." Thus, jurors would have to find that Dr. Killian's medical examinations were "job-related and consistent with business necessity."

As was true at summary judgment, this appeal concerns only the two medical exams by Dr. Killian. Painter principally argues that a jury could conclude that those examinations were not job-related or consistent with business necessity. Employers bear the "quite high" burden of establishing that compelled medical examinations are consistent with business necessity. *Wright v. Ill. Dep't of Children & Family Servs.*, 798 F.3d 513, 523 (7th Cir. 2015).

The Equal Employment Opportunity Commission has issued guidance for § 12112(d)(4)(A). According to the EEOC, a medical examination is job related and consistent with business necessity if the employer has a reasonable belief based on objective evidence that a medical condition will impair an employee's ability to perform essential job functions or that the employee will pose a threat due to a medical condition. *EEOC Enforcement Guidance: Disability-Related Inquiries and Medical Examinations of Employees under the Americans with Disabilities Act* (*ADA*) (July 27, 2000), https://www.eeoc.gov/policy/docs/guidance-inquiries.html#6; *see Wright*, 798 F.3d at 523 (discussing EEOC's enforcement guidance); *Coffman v. Indianapolis Fire Dep't*, 578 F.3d 559, 565 (7th Cir. 2009) (same). "That an employee's behavior could be described as 'annoying or inefficient [does not] justify an examination; rather, there must be genuine reason to doubt whether that employee can perform job-related functions.'" *Wright*, 798 F.3d at 524 (quoting *Sullivan v. River Valley Sch. Dist.*, 197 F.3d 804, 811 (6th Cir. 1999) (alteration in *Wright*).

Preventing employees from endangering their coworkers is a business necessity: "a safe workplace is a paradigmatic necessity of operating a business." *EEOC v. AIC Sec. Investigations, Ltd.*, 55 F.3d 1276, 1283 (7th Cir. 1995). Employers need not retain workers who, because of a disability, might harm someone; such a rule would force an employer to risk a negligence suit to avoid violating the ADA. *Timmons v. Gen. Motors Corp.*, 469 F.3d 1122, 1129 (7th Cir. 2006); *Palmer v. Circuit Court of Cook Cty.*, 117 F.3d 351, 352 (7th Cir. 1997).

We start with Dr. Killian's first examination. Like the district court, we conclude that the undisputed evidence compels a finding that Dr. Killian's initial exam of Painter was job related and consistent with business necessity. Dr. Killian conducted that examination after Painter had precipitated the same type of complaints from coworkers in her new position as she had with coworkers in the Division of Traffic Safety. Dr. Killian reviewed complaints from Painter's former coworkers, including allegations that she snapped and screamed at them, gave blank stares and intimidating looks, ranted, constantly mumbled to herself, repeatedly banged drawers in her office, and had mood swings. Her coworkers also feared she would "go postal" or "blow up at any time." Similarly, Dr. Killian reviewed complaints from Painter's new coworkers, including allegations that she glared and growled at them; kept the log; was rude, angry, abrasive, aggressive, and threatening; and had mood swings. Her supervisor said that in 20 years as a manager he had never dealt with a similar employee. Several of Painter's coworkers had even alerted supervisors that they feared she might become physically violent. That Painter was paranoid is evident from the fact that she felt compelled to write extensively about coworkers in her log, often making at least one entry per hour. One time, according to Hunt, Painter burst into his office, her eyes darting back and forth, and pointed a finger at him while growling incoherently about approaching a coworker to ask her about God, the Bible, and the Ten Commandments. After that Hunt felt compelled to document their interactions. Painter admitted having issues with all of her new coworkers.

Likewise, on this record a reasonable jury also would have to find that Dr. Killian's second examination of Painter was job related and consistent with business necessity. That exam occurred after Painter was reprimanded for unprofessionally interacting with her coworkers. Dr. Killian reviewed an additional 160 pages of documentation from Malek-Robinson, including supervisor notes, discipline directives, email communications, and statements from other employees. This time, Dr. Killian saw supervisory notes suggesting that Painter had continued engaging in argumentative, confrontational, insubordinate, and disruptive behavior.

One coworker wrote about Painter's brash, condescending, intimidating, and accusatory manner. Dr. Killian also analyzed emails in which Painter exhibited paranoid behavior and accused others of hostile body language. Additionally, emails Painter sent directly to Dr. Killian strongly suggested that she suffered from a personality disorder. Moreover, around this time Painter sent her union representative an email that was perceived as threatening and led to police involvement. According to Dr. Killian, this incident contributed to his conclusion that Painter was paranoid in the

psychiatric sense, which is a risk factor for violence. Inquiries—even multiple inquiries—concerning a worker's psychiatric health may be permissible if they reflect concern for the safety of other employees and the public at large. *See Coffman*, 578 F.3d at 565. Here, the second examination was again based on the IDOT's reasonable concern for the safety of its employees.

Painter's remaining appellate claims are insubstantial. First, she contends that Hunt twice contradicted his earlier deposition testimony in the affidavit he submitted at summary judgment and thus the affidavit should have been stricken. But Painter never asked the district judge to strike this affidavit, so this appellate claim is waived. *See Beverly v. Abbott Labs.*, 817 F.3d 328, 335–36 (7th Cir. 2016). Regardless, the supposed contradictions are illusory.

One "contradiction" is Hunt's statement in the affidavit that Painter's coworkers had told him they feared she potentially was violent and dangerous, leading him to believe she presented a safety concern. In contrast, Painter asserts, Hunt never mentioned a safety concern during his deposition. But where is the contradiction? Hunt never testified that Painter's coworkers said they felt *safe* around her. Indeed, Painter's lawyer never asked Hunt during his deposition whether Painter's coworkers shared concerns that she might be dangerous. Moreover, Hunt testified that he believed Painter was disruptive, insubordinate, unprofessional, and uncooperative because he had seen her act harshly toward a coworker and he later read a series of emails she sent to that employee. Thus, Hunt's allegation that Painter was a safety concern augmented, rather than contradicted, his deposition. Augmentations that do not contradict are admissible. *Russell v. Acme-Evans Co.*, 51 F.3d 64, 68 (7th Cir. 1995).

The second "contradiction" Painter identifies is that during his deposition Hunt did not recall which labor-relations specialist recommended that Painter undergo an examination. In contrast, Hunt swears in his affidavit that the specialist was Ryan Amerson. True, there is a difference between "I don't recall" and "Ryan Amerson." But even if that difference is a "conflict," a later conflicting affidavit is allowed if a memory lapse plausibly explains the discrepancy. *Id.* In this case, Hunt was deposed four years after Painter's medical examination, and a memory lapse later corrected by reviewing documents plausibly explains the discrepancy.

Painter also argues that the IDOT could not avoid a trial without evidence identifying the decision-maker behind each challenged medical examination. Although Painter relies on *Kroll v. White Lake Ambulance Authority*, that Sixth Circuit

opinion does not conclude that the decision-maker must be identified. 763 F.3d 619, 623 (6th Cir. 2014). Rather, in a paragraph explaining the standards governing claims under § 12112(d)(4)(A), the *Kroll* court said that employers cannot satisfy the "business necessity" requirement with general assertions that compelling a medical examination is "convenient or expedient," but "[r]ather, the individual who decides to require a medical examination must have a reasonable belief based on objective evidence that the employee's behavior threatens a vital function of the business." *Id.* That statement cannot be read as defining a rule of law that a single decision-maker must be readily identifiable, especially when, as in this case, multiple people participated in deciding whether to compel the examination.

Last, Painter argues that the IDOT shopped around for a doctor until it received an opinion supporting its decision to fire her. But this contention has no support in the record. The IDOT received reports from two doctors, Dr. Fletcher and Dr. Killian. The IDOT sent Painter back to those same two doctors for reevaluations even after they initially had concluded that she was fit for duty. It was Dr. Fletcher, an occupational-medicine specialist with no expertise in diagnosing or treating mental health, who recommended that Painter be evaluated by a mental-health specialist. The initial selection of Dr. Lee came from him. And the only reason that the IDOT later substituted Dr. Killian for Dr. Lee is that Painter chose to continue treatment with Dr. Lee. The characterization of doctor shopping is frivolous.

Accordingly, we AFFIRM the district court's judgment.