In the

# United States Court of Appeals

### For the Seventh Circuit

No. 08-1642

TONYA COFFMAN,

*Plaintiff-Appellant,*

*v.*

INDIANAPOLIS FIRE DEPARTMENT, *et al.*,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Southern District of Indiana, Indianapolis Division.
No. 1:05-cv-199-RLY-JMS—**Richard L. Young**, *Judge.*

ARGUED OCTOBER 24, 2008—DECIDED AUGUST 20, 2009

Before EASTERBROOK, *Chief Judge*, and POSNER and ROVNER, *Circuit Judges*.

ROVNER, *Circuit Judge.* Indianapolis firefighter Tonya Coffman sued the Indianapolis Fire Department and several of its employees alleging sex discrimination under Title VII, 42 U.S.C. § 2000e *et seq.*, violations of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, and privacy intrusions amounting to violations of her due process rights under the Fourteenth

Amendment, *see* 42 U.S.C. § 1983. She also brought several state-law claims. Her claims arise from what she alleges were a number of discriminatory driving evaluations and fitness for duty evaluations. The district court dismissed the state-law claims without prejudice and granted the defendants' motion for summary judgment on all of Coffman's remaining claims. She appeals, and we affirm.

## I.

Coffman, who is by her own description five feet tall "with shoes on," began working for the Indianapolis Fire Department in April 2001. She worked as a "substitute" firefighter until 2005, rotating shifts at various fire stations throughout the Department. Her tenure was apparently unremarkable until late 2003. In October and November 2003, two fellow firefighters who had ridden as passengers with Coffman in department vehicles expressed concern about her driving ability. In the first e-mail, Lieutenant Montgomery Hoyt wrote Division Chief of Health and Safety, Howard Stahl, and Assistant Chief Mickey Radez, observing that Coffman needed to put the bench seat all the way forward in order to reach the pedals and needed to "literally hold on to the steering wheel for support."[1] Within several days

---

[1] Lieutenant Hoyt's e-mail is dated October 18, 2003, but Coffman denies driving with Hoyt before October 21st. She does not, however, go so far as to suggest that Lieutenant

(continued...)

another firefighter e-mailed several chiefs stating that he and Lieutenant Hoyt were concerned that Coffman could not safely operate the vehicle because she had to look through the steering wheel to see out the front window and use her upper body to hold herself up in her seat. Then in early November yet another firefighter wrote an e-mail to Chief Charlie Miller expressing his concern that Coffman could not reach the pedals in a particular squad car without sitting on the edge of the seat.

These e-mails prompted a series of so-called "safety evaluations" of Coffman's driving. Chief Stahl conducted the first evaluation in December 2003. Coffman sat in the driver's seat of three different squad cars while Chief Stahl reviewed her positioning. He concluded that "the only concern" was Coffman's proximity to the steering wheel and airbag, but he found "no safety concerns or reasons for not allowing Private Coffman to drive these squads." Chief Stahl did not, however, evaluate Coffman on squad 10, which she admitted was difficult to drive because neither the steering wheel nor seat back were adjustable. He recommended that Coffman work with Captain Julie Baade "for a short term for further evalua-tion." Captain Baade drove with Coffman twice and afterward e-mailed Chief Stahl with her opinion that Coffman "did a good job."

---

[1] (...continued)
Hoyt fabricated the incident, nor does she dispute that Chiefs Stahl and Radez received Lieutenant Hoyt's e-mail and pre-sumed his account to be true.

Despite Captain Baade's largely favorable report, the concern about Coffman's driving persisted into 2004 and expanded into a critique of her paramedic skills as well. In January of 2004, yet another fellow firefighter e-mailed Chief Stahl with a "few safety concerns" about Coffman's driving. They included his belief that the seat did not move forward enough for her to see properly over the wheel and his belief that she had difficulty maintaining proper contact with the pedals. The continuing concerns prompted another round of evaluations by Captain Baade. This time Captain Baade's report alleged deficiencies in other areas, including her perception that Coffman had difficulty socializing with and asking for help from fellow firefighters. Captain Baade gave Coffman a copy of the "review" for her to sign, and also documented her belief that Coffman "acted mad or upset" after going over the list.

Following Captain Baade's review, a number of officers broached concerns about Coffman's well-being and other issues. Specifically, the Emergency Medical Services Duty Officer, Gregory Robinson, e-mailed Chief Charlie Miller, stating that he had noticed that Coffman was "often alone or withdrawn" and seemed to be "defensive" for "no legitimate reason." Lieutenant Robinson's observations prompted a number of other individuals to become involved, including Chief Stahl.

Ultimately Lieutenant Robinson met with Coffman and another Lieutenant to discuss some of her "weaknesses" in EMS skills. Lieutenant Robinson later reported that Coffman had been "defensive" and that

she had wanted to know whether there were any complaints in writing.

Shortly thereafter, Chief Radez e-mailed all of the officers and instructed them that if they believed a firefighter was underperforming they should document their concerns. He also told the officers to recommend a professional evaluation if any concerns regarding mental or physical fitness for duty arose. The same day, Captain Brian Black e-mailed several fire chiefs after Coffman had been at his station only two days, noting that she seemed "withdrawn" and suggesting that it might be in "the best interest of everyone" to consult a professional. Several days later, Chief Longerich recommended that Coffman undergo a "fitness for duty psychological evaluation" and a continued assessment of her EMS skills and driving abilities. He also recommended that Coffman be transferred immediately from firefighting and EMS duties to "limited duty status."

Coffman then met with Dr. Deanna L. Bartholomew for an evaluation. Dr. Bartholomew concluded that although Coffman was not suffering from any type of psychological disorder (including depression), she was obviously unhappy with "some aspect of her worklife." She recommended referring Coffman to six weeks of individual therapy through a private therapist unaffiliated with the Department and recommended a light-duty assignment on account of Coffman's "withdrawn demeanor and unwillingness to explain what is bothering her." After just three sessions, the private therapist documented that he had "not noted any intellectual or emo-

tional difficulties which would interfere with her ability to perform her job." He thus recommended that she be returned for another fitness for duty evaluation. This time Dr. Bartholomew concluded based on Coffman's defensive attitude about why she was there that she was "overreacting . . . and acting out in an immature and hostile manner." Although she discerned "no evidence of mental or physical problems that would prevent her from effectively performing her job duties," Dr. Bartholomew nevertheless deemed her unfit for duty on account of her choice to be "extremely resistant."

A month passed before Coffman was again evaluated—this time by Dr. Jeffrey Savitsky. He deemed Coffman prepared to return to light-duty status for three or four weeks. Five weeks later, Coffman returned for a follow-up evaluation and Dr. Savitsky recommended that she return to active duty, which she did.

Coffman sued the Indianapolis Fire Department, Assistant Chief Radez, Chief Miller, and Chief Stovall, claiming that the driving tests and fitness for duty evaluations amounted to gender discrimination and sexual harassment under Title VII. She also alleged that the Department violated the ADA by requiring multiple medical examinations that were neither job-related nor consistent with business necessity. *See* 42 U.S.C. § 12112(d)(4)(A). Finally, she advanced a claim under § 1983 that the individual defendants had violated her procedural and substantive due process rights. The district court granted the defendants' motion for summary judgment on all of Coffman's federal claims.

**II.**

On appeal, Coffman contends that the district court incorrectly granted summary judgment on her Title VII claims, her ADA claim, and her due process claims. We review the district court's decision de novo, considering all facts in the light most favorable to Coffman. *See Teal v. Potter*, 559 F.3d 687, 691 (7th Cir. 2009).

Beginning with her Title VII claims, Coffman maintains that she advanced sufficient evidence of discrimination to withstand summary judgment under either the direct or indirect method articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). She makes much of the district court's decision to examine her discrimination and harassment claims under the indirect burden-shifting approach set out in *McDonnell Douglas*. She claims that she would have fared better on summary judgment had the district court analyzed her case under the so-called direct method.

In order to make out a case of sex discrimination without resorting to *McDonnell Douglas*, a plaintiff must provide either direct or circumstantial evidence that supports an inference of intentional discrimination. *E.g.*, *Petts v. Rockledge Furniture, LLC*, 534 F.3d 715, 720 (7th Cir. 2008). Coffman lacks any sort of direct admission of discriminatory intent, but she maintains that "a convincing mosaic of circumstantial evidence," *Phelan v. Cook County*, 463 F.3d 773, 779 (7th Cir. 2006) (quoting *Rhodes v. Ill. Dep't of Transp.*, 359 F.3d 498, 504 (7th Cir. 2004)), exists from which a juror could conclude that she was discriminated against on account of her sex and height.

Ordinarily circumstantial evidence consists of certain indicators that sex may be the real motivating force for employment decisions. As relevant here, we have in the past recognized two general categories of circumstantial evidence: (1) ambiguous statements or behavior toward other employees in the protected group that taken together allow an inference of discriminatory intent and (2) evidence of systemically better treatment of employees outside the protected class. *E.g.*, *Petts*, 534 F.3d at 721. Coffman does not advance a single instance where firefighters or members of the Department engaged in behavior or made comments suggesting a discriminatory attitude toward women. She does aver generally that the Department employed several short men who were never obligated to undergo driving evaluations, but this fact alone does little to show that men generally were treated differently by the Department.

She also claims that the fire department discriminated against her as a short female in particular. We have not yet decided in this circuit whether we recognize a "sex-plus" theory of discrimination, *see Logan v. Kautex Textron N. Am.*, 259 F.3d 635, 638 n.2 (7th Cir. 2001), which hinges on disparate treatment based on sex in conjunction with another characteristic, *see Phillips v. Martin Marietta Corp.*, 400 U.S. 542 (1971) (per curiam) (recognizing viability of female's claim that hiring policy discriminated against women with pre-school age children). We need not decide today, however, because Coffman fails to develop her "sex plus" argument. She also fails to provide evidence—required under the "sex plus" formula-

tion—that the defendants took an adverse employment action at least in part on account of sex. *See Chadwick v. WellPoint, Inc.*, 561 F.3d 38, 43 (1st Cir. 2009); *Back v. Hastings On Hudson Union Free Sch. Dist.*, 365 F.3d 107, 118 (2d Cir. 2004) ("The term 'sex plus' or 'gender plus' is simply a heuristic . . . developed in the context of Title VII to affirm that plaintiffs can, under certain circumstances, survive summary judgment even when not all members of a disfavored class are discriminated against.").

Whether or not we explicitly recognize "sex plus height" as a vehicle for a Title VII discrimination suit, Coffman must demonstrate that the driving evaluations, the fitness for duty evaluations, and the subsequent suspensions from duty and reassignment to light duty occurred at least in part because she is female. On this front, Coffman simply reiterates that she "is a woman and therefore a member of a protected class under Title VII." The fact that she is a female, without more, goes nowhere towards demonstrating mistreatment *on account of* her sex. Certainly many females (and males) have endured unpleasant behavior in a work force, but Title VII is not a panacea for bad behavior in the workplace; it forbids discrimination with respect to an individual's "compensation, terms, conditions, or privileges of employment, *because of* such individual's . . . sex[.]" 42 U.S.C. § 2000e-2(a)(1) (emphasis added). In short, Coffman has failed to link her treatment—through either circumstantial or direct evidence—with the fact that she is female. Summary judgment was thus appropriate on Coffman's Title VII discrimination claim. *See Stearns v. Consol. Mgmt., Inc.*, 747

F.2d 1105, 1109 (7th Cir. 1984) (noting plaintiff's obligation to "prove that her sex was a motivating factor" in her supervisor's actions).

Coffman also maintains that the job criticism, performance evaluations and psychological evaluations amounted to "gender harassment" that created a hostile work environment. In order to sustain such a claim under Title VII, Coffman must demonstrate workplace harassment that is both objectively and subjectively severe and pervasive. *E.g.*, *Lloyd v. Swifty Transp., Inc.*, 552 F.3d 594, 603 (7th Cir. 2009). In addition to demonstrating harassment so severe and pervasive that it altered the terms and conditions of her employment and created an abusive working environment, Coffman must demonstrate a link between the adverse treatment and her sex. *Henry v. Milwaukee County*, 539 F.3d 573, 586 (7th Cir. 2008).

We do not think Coffman endured objectively severe and pervasive harassment. Undoubtedly the repeated driving evaluations and the fitness for duty examinations were subjectively unpleasant. Particularly given Coffman's alleged lack of knowledge as to what prompted the series of evaluations and exams, it could not have been easy for Coffman to go through the repeated critiques of her driving, her paramedic skills, and her mental stability. Nonetheless, we do not think the evaluations amounted to demeaning, degrading, or hostile behavior by the defendants. *See Hilt-Dyson v. City of Chicago*, 282 F.3d 456, 463-64 (7th Cir. 2002) (plaintiff's subjective belief that workplace incidents were demeaning and degrading

insufficient to create actionable harassment under Title VII). Assuming Coffman is correct that the examinations were not motivated primarily out of concern for her well-being and the safety of others, we still do not believe having to undergo a number of skills and even mental examinations can be construed as hostile and discriminatory. *See Hildebrandt v. Ill. Dep't of Natural Res.*, 347 F.3d 1014, 1035 (7th Cir. 2003). The record reveals that most of the critiques Coffman endured were accompanied by offers of support and guidance presumably intended for her own assistance. Moreover, Coffman has again failed to adduce evidence that she was targeted for scrutiny on account of her sex. *Id.* at 1034 (reiterating necessity of demonstrating that harassment occurred on account of sex).

Coffman next claims that the fire department violated the ADA by referring her for unnecessary psychological evaluations. Section 12112(d)(4)(A) of the ADA prohibits covered entities from requiring a medical examination or inquiring whether an "employee is an individual with a disability or as to the nature or severity of the disability, unless such examination or inquiry is shown to be job-related and consistent with business necessity." 42 U.S.C. § 2112(d)(4)(A). The ADA also allows inquiries "into the ability of an employee to perform job-related functions." *Id.* at § 12112(d)(4)(B).

Coffman maintains that no objective evidence supported the defendants' decision to refer her for the fitness for duty evaluations. The EEOC enforcement guidelines state that a medical examination is job-related

and consistent with business necessity when an employer has a reasonable belief based on objective evidence that a medical condition will impair an employee's ability to perform essential job functions or that the employee will pose a threat due to a medical condition. We have acknowledged that inquiries into an employee's psychiatric health may be permissible when they reflect concern for the safety of employees and the "public at large." *See Krocka v. City of Chicago*, 203 F.3d 507, 515 (7th Cir. 2000); *see also Conroy v. N.Y. State Dep't of Corr. Servs.*, 333 F.3d 88, 99 (2d Cir. 2003) (noting that "what constitutes a business necessity will undoubtedly vary in different workplaces").

Here, the Department's decision to refer Coffman for the fitness for duty evaluations took place against the backdrop of two firefighter suicides in the preceding months. Coffman's well-being was essential not only to her safety but to the public at large; thus, the Department had a particularly compelling interest in assuring that she was both physically and mentally fit to perform her duties. Here, multiple firefighters had expressed concern that Coffman did not seem like herself. When Chief Radez referred Coffman for an evaluation, he reported that although Coffman had initially been outgoing, she had become guarded to the extent that he believed there was a possibility that she was suffering from paranoia. Brian Black also reported to Chief Radez that Coffman seemed withdrawn and uncommunicative with other firefighters. In an April 2004 e-mail to Chief Miller, Gregory Robinson stated that he was "concerned about Tonya's mental well-being" and that he believed

that she "showed signs of depression, more than just having a bad day." Robinson based his assessment on his observation that Coffman seemed unable "to make decisions or even perform routine tasks on the scene of an incident without being told or prompted." Robinson also noted that at the firehouse Coffman was often "alone or withdrawn" and became "defensive" for "no legitimate reason." Robinson acknowledged that he was not a "trained psychologist," but pointed out that in light of the tragic incidents with two other firefighters he thought himself obligated not to "ignore these apparent symptoms of depression." That same day Brian Black e-mailed several chiefs with his observation that Coffman seemed different than other substitutes he had seen at the station in that she was withdrawn and not very communicative. He admitted the possibility that knowledge of Coffman's history could be coloring his judgment, but thought that particularly in light of the recent suicides "it may be in the best interest of everyone concerned that a professional be consulted" to correct any problems "so all parties can get [on] with their jobs."

The e-mails paint a consistent picture of genuine concern that Coffman's behavior was uncharacteristic and was adversely impacting her ability to perform her job. Although a psychological evaluation in response to "withdrawn" and "defensive" behavior might not be job-related in many vocations, we do not second-guess the propriety of such an evaluation for a firefighter. The Department has an obligation to the public to ensure that its workforce is both mentally and physically capable

of performing what is doubtless mentally and physically demanding work. This special work environment convinces us that the Department's decision to refer Coffman for the fitness for duty evaluations was job-related and consistent with business necessity. *See Krocka*, 203 F.3d at 515; *see also Conroy*, 333 F.3d at 99; *Watson v. City of Miami Beach*, 177 F.3d 932, 935 (11th Cir. 1999) ("In any case where a police department reasonably perceives an officer to be even mildly paranoid, hostile, or oppositional, a fitness for duty examination is job related and consistent with business necessity.").

Finally, Coffman argues that the Department violated both her substantive and procedural due process rights by disclosing her medical records and failing to hold a hearing before suspending her from her regular firefighting duties. She maintains that because there was no legitimate reason to refer her for a psychological evaluation, that decision was arbitrary and violated her substantive due process rights.

The due process clause of the Fourteenth Amendment protects an individual's "interest in avoiding disclosure of personal matters." *Whalen v. Roe*, 429 U.S. 589, 599 (1977); *see also Denius v. Dunlap*, 209 F.3d 944, 955 (7th Cir. 2000). In our circuit, this interest includes a "qualified" constitutional right to the confidentiality of medical records and communications. *Anderson v. Romero*, 72 F.3d 518, 522 (7th Cir. 1995); see also *Denius*, 209 F.3d at 956. Although Coffman maintains that we must apply strict scrutiny to any disclosure of her medical records, we have never articulated the precise test for an alleged

violation of the right of confidentiality. *Denius*, 209 F.3d at 956 ("[W]hile it is apparent that some form of balancing test would be used to determine when this right of confidentiality has been violated, that test has not yet been defined in this Circuit."). We reject Coffman's invitation to adopt a strict scrutiny test for the disclosure of medical records. It is unnecessary to articulate the level of scrutiny necessary to support such a disclosure, because under any formulation, the Department's decision passes muster. As explained above, the Department has a compelling interest in ensuring both the physical and mental well-being of its force. And for the reasons discussed above, the Department's decision to refer Coffman for the fitness for duty evaluations was not arbitrary—it was based on observations from multiple sources questioning Coffman's fitness for duty.

Coffman next argues that the Department's failure to provide her with notice and a hearing prior to her suspension from regular firefighting duties violated her procedural due process rights. In the district court, Coffman maintained that she had a protected property interest in her employment—an argument the district court rejected because she failed to identify any statutory provision granting her a property interest in her employment as a firefighter. Coffman now argues, relying on *City of Mishawaka v. Stewart*, 310 N.E.2d 65 (Ind. 1974), that she possessed a legally protected property interest in her employment as a firefighter. *Mishawaka* recognizes that "the tenure rights of policemen and firemen are legally protected rights that the courts will safeguard as carefully as if they were legally protected

contract or property rights." *Mishawaka*, 310 N.E.2d at 676. Leaving aside the fact that Coffman is developing her claim for the first time on appeal, *Mishawaka* does little for Coffman since—unlike the plaintiff in *Mishawaka*—she was never deprived of her job as a firefighter. And she cites no precedent for the proposition that she was entitled to a hearing before her temporary suspension from regular duties. *Cf. Chicago United Industries, Ltd. v. City of Chicago*, 445 F.3d 940, 944 (7th Cir. 2006) ("The amount and timing of the process due when a deprivation of liberty or property . . . is alleged varies with the circumstances."). We thus reject her procedural due process claim.

### III.

For the foregoing reasons we AFFIRM the judgment of the district court.