Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
07/26/2019 09:06 AM CDT

Ian B. McPherson, appellant, v. City of Scottsbluff,
in the County of Scotts Bluff, in the
State of Nebraska, appellee.

___ N.W.2d ___

Filed July 26, 2019.    No. S-18-834.

1. **Summary Judgment: Appeal and Error.** An appellate court will affirm a lower court's grant of summary judgment if the pleadings and admitted evidence show that there is no genuine issue as to any material facts or as to the ultimate inferences that may be drawn from those facts and that the moving party is entitled to judgment as a matter of law.

2. ____: ____. In reviewing a summary judgment, an appellate court views the evidence in the light most favorable to the party against whom the judgment was granted and gives that party the benefit of all reasonable inferences deducible from the evidence.

3. **Fair Employment Practices: Discrimination: Proof.** To show a business necessity for requiring an employee (as distinguished from an applicant) to submit to a medical examination under Neb. Rev. Stat. § 48-1107.02(1)(j) (Cum. Supp. 2018), an employer has the burden to show that (1) the business necessity is vital to the business; (2) it has a legitimate, nondiscriminatory reason to doubt the employee's ability to perform the essential functions of his or her duties; and (3) the examination is no broader than necessary. There must be significant evidence that could cause a reasonable person to inquire as to whether an employee is still capable of performing his or her job. An employee's behavior cannot be merely annoying or inefficient to justify an examination; rather, there must be genuine reason to doubt whether that employee can perform job-related functions.

4. **Fair Employment Practices: Proof.** A plaintiff must establish a prima facie case of retaliation under Neb. Rev. Stat. § 48-1114 (Reissue 2010) by showing (1) he or she engaged in protected conduct, (2) he or she was subjected to an adverse employment action, and (3) there was a causal connection between the protected conduct and the adverse action.

Appeal from the District Court for Scotts Bluff County: Leo P. Dobrovolny, Judge. Affirmed.

Joy Shiffermiller and Abby Osborn, of Shiffermiller Law Office, P.C., L.L.O., for appellant.

Steven W. Olsen and Paul W. Snyder, of Simmons Olsen Law Firm, P.C., L.L.O., for appellee.

Heavican, C.J., Miller-Lerman, Cassel, Stacy, Funke, and Papik, JJ.

Papik, J.

Ian B. McPherson was a police officer for the City of Scottsbluff, Nebraska (City). After the police chief became concerned that McPherson was exhibiting irrational, paranoid, and hostile behavior, he asked McPherson to undergo a fitness-for-duty examination (FFDE). McPherson refused, and the City terminated his employment. McPherson sued, alleging discrimination and retaliation under the Nebraska Fair Employment Practice Act (NFEPA). The district court granted the City's motion for summary judgment. McPherson now appeals.

As to McPherson's discrimination claim, we find that based on the undisputed evidence in the summary judgment record, the City could lawfully require McPherson to undergo an FFDE under Neb. Rev. Stat. § 48-1107.02(1)(j) (Cum. Supp. 2018). And because McPherson alleged that the City retaliated against him for expressing disapproval of the actions of his fellow employees, as opposed to his employer, there is no genuine issue of material fact as to whether he engaged in protected activity pursuant to Neb. Rev. Stat. § 48-1114(3) (Reissue 2010). Accordingly, we affirm.

## BACKGROUND

McPherson worked for the City as a patrol officer from January 19, 2010, to February 3, 2016, when the City terminated his employment. The City had no records that McPherson, whose job performance met standards, had any disability.

McPherson filed a complaint alleging disability discrimination and retaliation under NFEPA. He claimed that the City fired him after he reported his belief that members of the police department were involved in a break-in on police property. He asserted that the City violated NFEPA by requiring him to take a FFDE that was not job related and consistent with business necessity and by retaliating against him because he opposed unlawful practices.

The City's answer contended that the FFDE was job related and consistent with business necessity and that it fired McPherson for insubordination in not submitting to the FFDE when ordered. The City moved for summary judgment, and McPherson moved for partial summary judgment on liability. The district court conducted a hearing on the motions. The evidence received at the hearing demonstrated that McPherson's termination came about as described below.

*McPherson Raises Concerns*
*Regarding Break-In.*

On or about November 3, 2015, the evidence lockers for the Scottsbluff Police Department were burglarized. After learning about the break-in, McPherson became suspicious that two of his colleagues, Officers William Howton and Matthew Herbel, were responsible.

On December 2, 2015, McPherson contacted Brandi Brunz, one of the police department's investigators, and reported that he believed Howton and Herbel were involved with the burglary. Brunz encouraged McPherson to discuss the matter with Capt. Brian Wasson.

That evening, McPherson contacted Wasson, stating that he needed to talk to Wasson immediately and needed to "get something off of his chest." At that time, McPherson was driving around in Scottsbluff, but he told Wasson he would be more comfortable meeting in Gering, Nebraska. Wasson agreed to meet in Gering, where McPherson told him that what he was about to say would make Wasson think McPherson was "crazy" and that it had been bothering him for days, so

much so that he had not been eating. McPherson informed Wasson that he suspected the burglary of the evidence lockers was a staged event to compromise a particular homicide investigation.

McPherson explained to Wasson that on the night of the burglary, the Scottsbluff chief of police, Kevin Spencer (Chief Spencer), had given a speech to a group of nurses and that Chief Spencer might have discussed some confidential information about a homicide. McPherson believed that the speech referring to the homicide and the burglary of the evidence lockers the same night were not coincidental. He further said he believed that someone had made a "statement" at the burglary site by leaving rubbed patterns on a car that was related to the homicide investigation.

McPherson also recalled that the day before the burglary, Herbel had asked him to go hunting the next morning, which McPherson thought was strange, because Herbel had never asked McPherson to go hunting before. McPherson told Wasson he believed this was to establish an alibi for the burglary. McPherson also stated that shortly before the burglary was discovered, Howton asked McPherson, "'Has anything big happened yet?'" McPherson considered this suspicious, because he did not recall Howton ever asking him something like that before.

McPherson reported to Wasson that soon after the burglary, he was driving off duty when he noticed Howton driving nearby. Howton pulled over to talk to McPherson. McPherson said that when Howton approached him to talk, McPherson immediately got the "'Heebie Jeebies.'" McPherson stated that Howton discussed the burglary with him and that McPherson felt Howton kept looking over his shoulder "as if he was paranoid." In an affidavit prepared for trial, McPherson asserted that Howton appeared tense, was scanning the area, and had his hand on his gun during his conversation with McPherson, but it is not clear from the affidavit whether McPherson reported these details to Wasson.

McPherson further described to Wasson an incident earlier in the day on December 2, 2015. McPherson stated during a conversation about the burglary, Howton asked what was going on with the burglary case. McPherson claimed this was of significant concern, because it was inconceivable that Howton had not already looked at the case file. Howton also asked McPherson what the report number was for the burglary and what was depicted in a particular crime scene photograph. According to McPherson, this was concerning, because he claimed that Howton had to have already known this information and was only asking in an attempt to conceal the fact that he was involved in the burglary.

When Wasson asked what motive Howton or Herbel would have to burglarize the evidence lockers, McPherson theorized that Howton may want to compromise the homicide investigation because his brother might have been involved in the homicide. McPherson's explanation for suspecting Howton's brother was based on his understanding that the homicide involved a homosexual relationship and his suspicion that Howton's brother is gay. McPherson based his suspicion that Howton's brother was gay on his observation that Howton had never formally introduced his brother to McPherson. In addition, McPherson said Howton's wife made remarks to McPherson's wife that made McPhersons' wife suspect Howton's brother is gay. McPherson also pointed out that like an individual in the homicide case, Howton and Howton's brother had previously worked in construction.

McPherson also presented the theory that Howton and Herbel were motivated by money. McPherson said that Howton makes multiple drug arrests, but that Howton seems to seize less money than other officers. McPherson stated that based on his knowledge of Howton's possessions and debts owed by Howton's wife, it does not appear Howton "lives within his means."

Last, McPherson said perhaps Howton and Herbel wanted to make the department look bad, claiming that Howton and

Herbel do not like the current police administration. McPherson supported this theory by stating he heard the two officers discussing the homicide case and that Herbel agreed when Howton said, "'They won't be able to keep this out of the media.'"

The next morning, on December 3, 2015, McPherson sent an email to other patrol officers asking for extra patrol around his house. The email included photographs of shoeprints and of circles drawn in the snow. Brunz spoke to McPherson about the email, and McPherson told her that he believed the circles in the snow were "'glasses or eyes'" that someone had drawn. McPherson also told Brunz that he noticed a patrol car driving slowly near his house the night he first reported his suspicions about the burglary and that he had trouble sleeping afterward.

Wasson drafted a report of his conversations with Brunz and McPherson and provided it to Chief Spencer. The report did not include any statement by McPherson that Howton had his hand on his weapon during the conversation that gave McPherson the "Heebie Jeebies." Wasson's report caused Chief Spencer to be concerned because, according to Wasson's account, McPherson said he had not been eating, the allegations McPherson made struck Chief Spencer as bizarre, and the allegations were made against McPherson's self-described friends.

By this time, investigators had identified a burglary suspect through several pieces of evidence. (This suspect eventually pleaded guilty to theft charges.) Nevertheless, Chief Spencer referred McPherson's allegations to the Nebraska State Patrol via an assistant attorney general for investigation, as he did not believe it was appropriate for the department to conduct its own investigation. Chief Spencer explained to the assistant attorney general that he was "concerned about Officer McPherson's wellbeing knowing that he is a war veteran and this behavior seemed very out of character."

Based on McPherson's reports to Wasson, the assistant attorney general agreed that there was no basis to believe any officers had been involved in the burglary. Even so, Chief Spencer

and the assistant attorney general arranged for McPherson to report the allegations to Sgt. Monte Lovelace of the Nebraska State Patrol.

On December 4, 2015, Chief Spencer contacted Dr. Matthew Hutt, a psychologist. Dr. Hutt told him these statements raised concerns about McPherson's fitness for duty and referred Chief Spencer to a colleague in Omaha, Nebraska, who specialized in law enforcement and had conducted FFDE's.

On December 7, 2015, when Chief Spencer told McPherson about the arrangements for him to speak to Lovelace, McPherson again talked about the shoeprints in the snow and the circles that he thought represented eyes or glasses. McPherson said he thought it was a "sign" from Howton that he was watching McPherson.

*State Patrol Interviews McPherson.*

On December 7, 2015, Lovelace interviewed McPherson about his allegations. Prior to the interview, Lovelace had never met McPherson nor did he have any information regarding McPherson's mental health or any information that it was a concern. At a deposition, Lovelace described McPherson's demeanor during the interview as very nervous, troubled, standoffish, closed off, always frowning, and almost beside himself. Lovelace stated that the information McPherson gave was erratic and irrational and that it led him to be concerned about McPherson.

In the interview, McPherson related to Lovelace many of the same incidents he had described to Wasson, including his roadside interaction with Howton. McPherson told Lovelace, as he had told Wasson, that as soon as Howton began to approach McPherson's vehicle, McPherson got the "Heebie Jeebies." McPherson also told Lovelace that he was not sure why he felt that way and that in response to this feeling, McPherson put his gun under his arm and put his vehicle in reverse. McPherson said he was extremely scared while talking to Howton, that he did not know how he was going to get himself out of the situation, and that he realized he had made a mistake in talking

to Howton about the burglary. McPherson's description of this interaction made Lovelace concerned about the safety of McPherson and other officers.

McPherson also told Lovelace about his concern that Howton, who McPherson considered his best friend, made many drug arrests but never had large amounts of cash, and he wondered how Howton could afford all that he had. McPherson told Lovelace that he asked his wife, who works at a bank, to look into Howton's loan records.

McPherson expressed a firm conviction that his colleagues were involved in the break-in at the department. McPherson said that because he suspected his good friends, he had initially questioned whether he was "losing [his] mind" or whether he was "going crazy" and stated that "this is absolutely insane." He stated that prior to his discussion with Wasson, his suspicions had been "eating [him] up." McPherson implied that after he spoke to Wasson, the tracks in the snow at his residence confirmed what he suspected.

Following the interview, Lovelace and the assistant attorney general concluded that McPherson's information lacked any factual basis upon which to open an investigation and that there was no basis to investigate further.

On December 14, 2015, Lovelace informed Chief Spencer of his concerns and findings. He also told Chief Spencer that he wondered if McPherson was experiencing some sort of paranoia. Chief Spencer listened to the recorded version of Lovelace's interview with McPherson, and several comments made by McPherson, summarized above, caused Chief Spencer concern that McPherson might be irrational and displaying signs of paranoia and hostility. Like Lovelace, Chief Spencer was particularly concerned that McPherson felt the need to arm himself during a conversation with Howton, because it implicated the safety of other officers.

*City Follows Up With McPherson.*

McPherson again met with Wasson on December 14, 2015. Wasson said that McPherson was "difficult to follow" during

the conversation, that he could not articulate his suspicions in any order, and that he appeared to be paranoid in most of his interactions with Howton and Herbel.

McPherson began the conversation by confirming that Wasson had received the information about the shoeprints and "eyeballs" drawn in the snow around his house. McPherson told Wasson that he believed Howton had very slowly driven by his home, was involved with the markings in the snow, and was watching McPherson's home. McPherson also said that Howton appeared to be watching him closely during a recent briefing when McPherson took a photograph of another officer's boots. He further stated that he thought he was also "'getting the eyeball from Officer Herbel.'"

McPherson then brought up events that occurred on December 12, 2015, when he took a "short day" and came in late. McPherson thought it odd that Howton asked where he was at shift change. McPherson went on to tell about his observations of several other officers that day and described their behavior as strange. McPherson then told Wasson he had convinced himself that the officers assisted with the burglary to anger the administration and that all the details seemed to fit together.

McPherson described to Wasson in detail how easy it would be for them to burglarize the evidence lockers while on duty. McPherson recounted that he told Herbel that if McPherson were a serial killer, it would be easy for him to "log body parts into evidence." McPherson noted that this statement appeared to make Herbel uncomfortable. He also said that Howton's wife had come over in the past to chat and that he believed she was attempting to get information from McPherson and his wife by asking open-ended questions. He informed Wasson that he felt Howton knew McPherson was "onto something" and was "trying to figure out what it is."

McPherson told Wasson that he was angry with Howton and Herbel. He was confident that they were involved in the burglary and that they were "throwing it in his face." McPherson

indicated that he could not think of any other explanation for their behavior.

Wasson reported the conversation to Chief Spencer. It caused Chief Spencer to be more concerned about McPherson and his statements. Chief Spencer felt it was his duty to take all action necessary to ensure the officers and the public were safe, especially because McPherson's job duties as a patrol officer included carrying a firearm and being involved in high risk and high pressure situations. Chief Spencer questioned whether McPherson could perform his duties without posing a threat to himself and others.

*City Arranges FFDE, and McPherson*
*Refuses to Participate.*

Chief Spencer contacted Dr. Shari Conner, a psychologist. Chief Spencer informed Dr. Conner of McPherson's statements and sent her written reports. Like Dr. Hutt, she advised Chief Spencer that McPherson's behavior raised concerns about his fitness for duty. Chief Spencer arranged an FFDE for McPherson.

When Chief Spencer informed McPherson that he had arranged an FFDE, McPherson stated he was expecting this, agreed to go to Omaha for the FFDE, and told Chief Spencer that if something was wrong, he needed to know too. According to Chief Spencer, at that time, McPherson pointed to his head, stating that he had been "wondering himself."

The City placed McPherson on administrative leave with pay. McPherson subsequently retained counsel and canceled the FFDE appointment. Counsel for McPherson then corresponded with the City about scheduling another FFDE, but McPherson again opted not to attend. In response, Chief Spencer ordered McPherson to attend the FFDE. Chief Spencer informed McPherson that if he refused to attend, he would consider preparing an accusation for termination for insubordination. McPherson refused to participate in the FFDE.

Chief Spencer and McPherson then met, with McPherson's counsel present. Chief Spencer asked McPherson why he

should not be recommended for termination. McPherson gave no response. Chief Spencer filed an accusation recommending termination of McPherson's employment and sent it to the Scottsbluff city manager for further action.

The city manager met with McPherson and his counsel and advised McPherson that he was considering terminating McPherson's employment and asked if McPherson had any reason why he should not take that action. McPherson gave no response.

On February 1, 2016, the city manager asked McPherson and his counsel to discuss the matter further and to respond by 2 p.m. on February 2. McPherson did not respond by the deadline. On February 3, the city manager delivered a letter to McPherson informing him that his employment had been terminated for his refusal to follow Chief Spencer's order to attend the FFDE.

*District Court's Rulings.*

The district court overruled McPherson's motion for summary judgment and sustained the City's motion for summary judgment. In its written order, the district court stated that it found no dispute as to the following facts: There was no factual basis for McPherson's allegations concerning the burglary, McPherson was concerned about his own mental health, behavior by other officers that McPherson considered suspicious had reasonable explanations, McPherson thought he was being watched by other officers, McPherson suddenly felt threatened during a conversation with Howton on the street and secretly held his gun, and McPherson had his wife secretly look into Howton's bank records.

Regarding McPherson's discrimination cause of action, the district court found that McPherson was fired for refusing to submit to the FFDE and not because he was regarded as having a disability. It determined that the requested FFDE was job related and of business necessity, considering McPherson's undisputed behavior. According to the court, the City was reasonable in requiring the FFDE.

As to McPherson's claims of retaliation, the district court found no evidence to support a finding that the City was retaliating against McPherson for reporting his belief that other officers were involved in the burglary. It observed that the City had thoroughly followed up on his concerns.

## ASSIGNMENTS OF ERROR

McPherson assigns, condensed and rephrased, that the district court erred in (1) finding that the City was entitled to summary judgment on his claim that it had violated NFEPA by unlawfully requiring him to submit to an FFDE and (2) finding that the City was entitled to summary judgment on his claim that the City had retaliated against him for opposing unlawful activity.

McPherson's summary of his argument also asserts that the district court judge erred in not recusing himself, but this alleged error is neither assigned nor argued, and we will not consider it. See *State v. Munoz, ante* p. 69, 927 N.W.2d 25 (2019).

## STANDARD OF REVIEW

[1,2] An appellate court will affirm a lower court's grant of summary judgment if the pleadings and admitted evidence show that there is no genuine issue as to any material facts or as to the ultimate inferences that may be drawn from those facts and that the moving party is entitled to judgment as a matter of law. *Larsen v. 401 Main St.*, 302 Neb. 454, 923 N.W.2d 710 (2019). In reviewing a summary judgment, an appellate court views the evidence in the light most favorable to the party against whom the judgment was granted and gives that party the benefit of all reasonable inferences deducible from the evidence. *Id.*

## ANALYSIS

*FFDE Claim.*

We begin with McPherson's assertion that there are genuine issues of material fact that precluded the district court from

granting the City summary judgment on his claim that the City discriminated against him by unlawfully requiring him to submit to an FFDE. McPherson is correct that under NFEPA, requiring a disabled employee to undergo an examination can, under certain circumstances, constitute employment discrimination. See § 48-1107.02(1)(j). The parties dispute whether McPherson was a "qualified individual with a disability" eligible for the protections of NFEPA in the first place. See, § 48-1107.02(1); Neb. Rev. Stat. § 48-1102(9) (Cum. Supp. 2018) (defining "[d]isability" as "(a) a physical or mental impairment that substantially limits one or more of the major life activities of such individual, (b) a record of such an impairment, or (c) being regarded as having such an impairment"). But even assuming without deciding that he was, we disagree with McPherson's contention that there was a genuine issue of fact as to whether the City committed discrimination in requiring an FFDE. We conclude that the record contains undisputed evidence that the City's actions fell under NFEPA's business necessity exception.

[3] NFEPA provides that it is an act of discrimination for an employer to require a "qualified individual with a disability," § 48-1107.02(1), to submit to a medical examination "unless the examination or inquiry is shown to be job-related and consistent with business necessity," § 48-1107.02(1)(j). We have held that to show a business necessity for requiring an employee to submit to a medical examination under § 48-1107.02, an employer has the burden to show that (1) the business necessity is vital to the business; (2) it has a legitimate, nondiscriminatory reason to doubt the employee's ability to perform the essential functions of his or her duties; and (3) the examination is no broader than necessary. *Arens v. NEBCO, Inc.*, 291 Neb. 834, 870 N.W.2d 1 (2015). In this case, we understand McPherson to be contending that there were genuine issues of material fact regarding the second element of the business necessity exception: whether the City had a legitimate reason to doubt his ability to do his job. With respect to this

second element, we have held that there must be significant evidence that could cause a reasonable person to inquire as to whether an employee is still capable of performing his or her job. See *id*. An employee's behavior cannot be merely annoying or inefficient to justify an examination; rather, there must be genuine reason to doubt whether that employee can perform job-related functions. *Id.*

In order to determine whether there is reason to doubt that an employee is capable of performing his or her job, a court must also take account of what the job entails. See *Conroy v. New York Dept. of Correctional*, 333 F.3d 88, 99 (2d Cir. 2003) ("what constitutes a business necessity will undoubtedly vary in different workplaces"). In applying a provision of the federal Americans with Disabilities Act that is nearly identical to the provision of NFEPA at issue, see 42 U.S.C. § 12112(d)(4)(A) (2012), a number of federal courts have held that the unique nature of public safety work must be considered in determining whether a business necessity exists to support a request for an FFDE. We have previously held that it is appropriate to look to federal court decisions construing legislation similar to NFEPA. See *Hartley v. Metropolitan Util. Dist.*, 294 Neb. 870, 885 N.W.2d 675 (2016).

In *Watson v. City of Miami Beach*, 177 F.3d 932 (11th Cir. 1999), the court held that a municipality was entitled to summary judgment on a police officer's claim that the municipality discriminated against him by requiring him to undergo an unnecessary FFDE. The court explained that where a police officer's fitness for duty is at issue, an employer may require an FFDE when it "reasonably perceives an officer to be even mildly paranoid, hostile, or oppositional." *Id.* at 935. As the court explained:

> Police departments place armed officers in positions where they can do tremendous harm if they act irrationally. . . . [T]he [Americans with Disabilities Act] does not, indeed cannot, require a police department to forgo a fitness for duty examination to wait until a perceived

threat becomes real or questionable behavior results in injuries.

*Watson*, 177 F.3d at 935.

Similarly, in *Coffman v. Indianapolis Fire Dept.*, 578 F.3d 559 (7th Cir. 2009), the court held that behavior that might not justify a fitness for duty inquiry for some jobs will be sufficient to demonstrate a business necessity in a public safety position. In *Coffman*, a municipality had requested a firefighter to undergo an FFDE. In the course of its opinion affirming the entry of summary judgment in favor of the municipality, the court stated:

> Although a psychological evaluation in response to "withdrawn" and "defensive" behavior might not be job-related in many vocations, we do not second-guess the propriety of such an evaluation for a firefighter. The [fire] Department has an obligation to the public to ensure that its workforce is both mentally and physically capable of performing what is doubtless mentally and physically demanding work. This special work environment convinces us that the Department's decision to refer [the plaintiff] for the [FFDE's] was job-related and consistent with business necessity.

*Id.* at 566.

*Brownfield v. City of Yakima*, 612 F.3d 1140 (9th Cir. 2010), is yet another case in which a federal court of appeals held that a claim that a police officer was unlawfully forced to undergo an FFDE must be reviewed with the nature of the job in mind. In that case, the court explained that because police officers are likely to encounter stressful and dangerous situations, a police department can require its officers to undergo an FFDE if they have "good reason to doubt an officer's ability to respond to these situations in an appropriate manner." *Id.* at 1147.

Many other cases are to the same effect. See, e.g., *Wisbey v. City of Lincoln, Neb.*, 612 F.3d 667 (8th Cir. 2010) (nature of employee's position as emergency dispatcher involved lives

at risk, supporting business necessity exception), *abrogated on other grounds, Torgerson v. City of Rochester*, 643 F.3d 1031 (8th Cir. 2011); *Dengel v. Waukesha County*, 16 F. Supp. 3d 983 (E.D. Wis. 2014) (business necessity exception applied where employee who maintained radios used in emergency services and therefore vital to public safety displayed behavior that was obsessive, intense, and detached from reality); *Davis-Durnil v. Village of Carpentersville, Ill.*, 128 F. Supp. 2d 575 (N.D. Ill. 2001) (observing that police officers encounter stressful situations and that employers are entitled to inquire into their employees' mental health where it has legitimate concerns about employee and public safety).

In this case, as in many of the cases discussed above, there is much undisputed evidence demonstrating that the City had reason to doubt whether McPherson could perform the job-related duties of a police officer. This included the evidence that McPherson was aware of and had expressed to the City that his break-in theories were unlikely to be true to the point that they could cause uncertainty about his mental health. When he first reported his concerns about the break-in to Wasson, he prefaced his statements by saying Wasson was going to think he was "crazy," but that the issue had been bothering him for days, to the extent that he had not been eating. In his interview with Lovelace, McPherson acknowledged that his theories made him question whether he was "losing [his] mind" or "going crazy" and called the situation "absolutely insane," but he held to the firm conviction that his theories were true. And later, when McPherson initially agreed to Chief Spencer's request that he undergo an FFDE, McPherson pointed to his head and said that he had been "wondering himself." He told Chief Spencer that he had been expecting an FFDE and wanted to be the first to know if something was wrong.

Indeed, when Chief Spencer shared McPherson's statements and behavior with two psychologists, they suggested that something could, in fact, be wrong; they both told

Chief Spencer that the information raised red flags about McPherson's fitness for duty. Lovelace, who was not informed of concerns regarding McPherson's mental health prior to interviewing him, also expressed concerns about McPherson's well-being after the interview.

Also casting doubt on McPherson's fitness for duty as a police officer was McPherson's statement to Lovelace that based only on an unexplainable feeling of unease, McPherson prepared himself to use his firearm against Howton, his friend and fellow officer. Although the incident occurred while McPherson was off duty, it was reasonable for the City to consider it in evaluating McPherson's fitness for duty as a police officer, a job that placed him "in positions where [he could] do tremendous harm if [he were to] act irrationally." See *Watson v. City of Miami Beach*, 177 F.3d 932, 935 (11th Cir. 1999). As Chief Spencer described, McPherson's duties as a patrol officer included carrying a firearm and being involved in high risk and high pressure situations with the public and other officers.

We recognize that in his summary judgment affidavit, McPherson stated that Howton had his hand on his gun during the same conversation. McPherson did not tell Lovelace that he was concerned about Howton's having his hand on his gun, and it is not clear that McPherson ever told anyone at the City that Howton also had his hand on his gun. Even assuming he did, however, we find that McPherson's reaction, in view of all of the other evidence of concerning behavior by McPherson, could contribute to doubts about McPherson's ability to safely do his job.

In sum, the undisputed evidence establishes that the City had genuine reason to doubt whether McPherson could perform his duties as a police officer. His acknowledgment that his theories could call his mental health into question, the opinions of psychologists and other law enforcement professionals that his behavior raised concerns about his fitness for duty, and the incident in which he armed himself against Howton all support

the business necessity exception. Therefore, the district court did not err in granting summary judgment in favor of the City on McPherson's discrimination claim.

*Retaliation.*

[4] We turn now to McPherson's retaliation claim. A claim of retaliation under NFEPA is based on § 48-1114, which provides: "It shall be an unlawful employment practice for an employer to discriminate against any of his or her employees . . . because he or she . . . (3) has opposed any practice or refused to carry out any action unlawful under federal law or the laws of this state." A plaintiff must establish a prima facie case of retaliation under § 48-1114 by showing (1) he or she engaged in protected conduct, (2) he or she was subjected to an adverse employment action, and (3) there was a causal connection between the protected conduct and the adverse action. *Knapp v. Ruser*, 297 Neb. 639, 901 N.W.2d 31 (2017).

McPherson contends that reporting his suspicions about his fellow employees was protected conduct for which he was ultimately terminated, in violation of § 48-1114(3). But he overlooks this court's application of § 48-1114(3). In *Wolfe v. Becton Dickinson & Co.*, 266 Neb. 53, 662 N.W.2d 599 (2003), we rejected the "whistleblower" and retaliation claims of an employee who experienced adverse employment actions after reporting his belief that fellow employees were using illegal drugs. We expressly addressed whether § 48-1114(3) protects an employee's opposition to the illegal actions of fellow employees, and concluded that it does not. Considering the context of NFEPA and the purposes it was meant to serve, we held that "the 'practice' in § 48-1114(3) refers to an unlawful practice of the *employer*" and not "any manner of unlawful activity." *Wolfe*, 266 Neb. at 57, 662 N.W.2d at 603 (emphasis supplied). See, also, *Bonn v. City of Omaha*, 19 Neb. App. 874, 814 N.W.2d 114 (2012) (applying *Wolfe, supra*).

At oral argument, McPherson acknowledged that *Wolfe* requires an unlawful act of the employer and argued for the

first time that the City retaliated against him because he was critical of the department's investigation of the burglary. While McPherson is undoubtedly now critical of the department's investigation of the burglary, there is no evidence that those who made the decisions to ask McPherson to undergo an FFDE and, subsequently, to terminate his employment were made aware that McPherson felt the investigation was unlawfully inadequate.

In the absence of any knowledge that McPherson opposed the department's investigation, City officials could not have taken adverse action against McPherson based on that opposition. See *Ambrose v. Township of Robinson, Pa.*, 303 F.3d 488, 493 (3d Cir. 2002) ("[i]t is only intuitive that for protected conduct to be a substantial or motiv[at]ing factor in a decision, the decisionmakers must be aware of the protected conduct"). The City was entitled to summary judgment on McPherson's retaliation claim.

## CONCLUSION

For the foregoing reasons, we affirm the entry of summary judgment in favor of the City.

Affirmed.

Freudenberg, J., not participating.